## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Center for Biological Diversity,
378 N Main Avenue,
Tucson, AZ 85701,

and

Natural Resources Defense Council,
40 West 20th Street 11th floor,
New York, NY 10011,

*Plaintiffs,*

v.

Ryan Zinke, in his official capacity as Secretary of the
U.S. Department of the Interior;

U.S. Department of the Interior, an agency of the
United States;

Greg Sheehan, in his official capacity as Principal
Deputy Director of the U.S. Fish and Wildlife Service;

and

U.S. Fish and Wildlife Service, an agency of the
United States
1849 C Street, NW,
Washington, DC 20240,

*Defendants.*

Civ. No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.      Elephants in Africa have suffered catastrophic population declines in recent years

as they are targeted for their valuable ivory tusks. Nevertheless, the Secretary of the Interior and

the U.S. Fish and Wildlife Service ("FWS" or "the Service") have unjustifiably reversed course

1

and eliminated critical protections established just two years ago that prohibited the import of hunting trophies from African elephants killed in Zimbabwe. This agency action – predicated on an erroneous finding that the government of Zimbabwe has the capacity to sustainably manage elephant hunting – comes in the midst of a Zimbabwean coup d'état. Simultaneously, for the first time since listing African lions as threatened under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, the Service has made an unsupported finding that the trophy hunting of lions in Zimbabwe somehow meets the stringent conservation requirements of our nation's cornerstone wildlife protection statute. Following on the heels of the death of the now famous lion Cecil in Zimbabwe, the decision to sanction lion hunting by U.S. hunters raises serious conservation concerns.

2.      These two final agency actions are arbitrary and capricious, as the conclusions that trophy hunting of elephants and lions in Zimbabwe enhances the survival of the species are not supported by the evidence in the administrative record. The decisions undermine the agency's statutory duty to promote the conservation of species threatened with extinction and thus are not in accordance with law. Further, the government has failed to rationally explain its 180 degree turn from determining that Zimbabwe is incapable of managing elephant hunting sustainably, to proclaiming open season on elephants and lions in Zimbabwe, a top destination for American trophy hunters due to lax regulations exacerbated by rampant corruption.

3.      Therefore, Plaintiffs – conservation organizations with a vested interest in the protection of elephants and lions in Zimbabwe – seek judicial review of these flawed decisions pursuant to the Administrative Procedure Act. They respectfully ask this court to declare that these decisions are unlawful and violate the Administrative Procedure Act and Endangered Species Act and Defendants shall not issue any import permits pursuant to these findings; and

should grant Plaintiffs their fees and costs and such other relief as is necessary to protect these majestic animals.

## JURISDICTION AND VENUE

4.      This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-706.

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 28 U.S.C. §§ 2201-2202, and 5 U.S.C. § 702.

6.      Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e), as this civil action is brought against officers and employees of the United States acting in their official capacities and under the color of legal authority, a substantial part of the events giving rise to the claim occurred in the District of Columbia, no real property is involved in this action, and several Plaintiffs maintain offices in this judicial district.

## PARTIES

7.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit Internal Revenue Service Code Section 501(c)(3) corporation that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is actively involved in species and habitat protection issues and has more than 58,000 members throughout the United States and the world.  The Center is headquartered in Tucson, Arizona, with offices in Washington, D.C.; San Francisco, Joshua Tree, and Los Angeles, California; St. Petersburg, Florida; Portland, Oregon; Silver City, New Mexico; Anchorage, Alaska; Richmond, Vermont; Minneapolis and Duluth, Minnesota; and Seattle, Washington. The Center brings this action on its own institutional behalf, and on behalf of its members who derive scientific, aesthetic, recreational, and spiritual benefits from elephants,

lions, and their habitat. The Center advocates on the federal and international level for increased protections for African elephants and lions, including a pending petition to list both forest and savannah elephants in Africa as endangered and commenting on management plans for the species.

8.      Plaintiff NATURAL RESOURCES DEFENSE COUCIL ("NRDC") is a national nonprofit organization with hundreds of thousands of members whose mission is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. NRDC is headquartered in New York, New York, with offices in Washington, D.C.; San Francisco and Santa Monica, California; Chicago, Illinois; Bozeman, Montana, and Beijing, China. NRDC works at the state, and federal, and international levels to advance legal protections for endangered and threatened wildlife, including African elephants and lions.

9.      The interests of Plaintiffs and their members are harmed by the challenged FWS decisions authorizing the importation of elephant and lion trophies. Plaintiffs and their members devote substantial recreational time viewing, enjoying, studying, and photographing African elephants and lions. The interests of Plaintiffs and these members are threatened by the challenged FWS decisions, which will result in an increase of elephants and lions killed for recreational purposes, put unsustainable pressure on these imperiled  populations, and diminish Plaintiffs' and their members' ability to enjoy these majestic animals in the wild. Plaintiffs and their members have visited and will continue to visit Zimbabwe and/or trans-boundary parks that share elephant and lion populations with Zimbabwe to view, photograph, enjoy, and study elephants and lions. The challenged FWS decision harms Plaintiffs and their members' interests in observing and enjoying elephants and lions in Zimbabwe and surrounding areas because U.S. sport hunters remove approximately "54 percent" of the wildlife hunted for trophies, which is

primarily elephants but also includes "72 percent" of the lions that can be exported as trophies from Zimbabwe.

10.     The country-wide enhancement determinations also mean that Plaintiffs have to redouble their use of limited organizational resources to obtain copies of applications to import elephant and lion trophies from Zimbabwe – since these applications are not published in the Federal Register and are not timely released in compliance with the Freedom of Information Act – and dedicate organizational resources to commenting upon and tracking these permit applications. Plaintiffs must also dedicate time and resources to tracking down country of origin management plans and understanding their implementation (or lack thereof), reviewing scientific literature and collecting other information on population status of hunted species, and researching the current regulatory and enforcement regime and tracking illegal activities.

11.     Defendant RYAN ZINKE, United States Secretary of the Interior, is the highest-ranking official within the U.S. Department of the Interior, and in that capacity, has ultimate responsibility for the administration and implementation of the ESA with regard to terrestrial endangered and threatened species, and for compliance with all other federal laws applicable to the Department of the Interior. Secretary Zinke is sued in his official capacity.

12.     Defendant DEPARTMENT OF THE INTERIOR is an agency of the federal government which is authorized to administer and implement the ESA.

13.     Defendant GREG SHEEHAN is Principal Deputy Director of the U.S. Fish and Wildlife Service, a federal agency within the Department of the Interior that is authorized and required by law to protect and manage the imperiled species protected under the ESA, to enforce and implement the Act, and for compliance with all other federal laws that apply to the Service.

The Service has primary authority for day-to-day administration of the ESA with respect to terrestrial species. Principal Deputy Director Sheehan is sued in his official capacity.

14.     Defendant the U.S. FISH AND WILDLIFE SERVICE is an agency or instrumentality of the United States, and is responsible for administering the provisions of the ESA with regard to threatened and endangered terrestrial species, including African elephants and lions. The Service's Division of Management Authority Branch of Permits in Falls Church, Virginia issued the enhancement findings, as approved by FWS headquarters in Washington, D.C., being challenged in this case.

## STATUTORY AND REGULATORY BACKGROUND

### A.     The Endangered Species Act

15.     The Endangered Species Act, 16 U.S.C. §§ 1531-1544, is the most comprehensive legislation for the preservation of threatened and endangered species ever enacted by any nation. In passing the Act, Congress found that different species "have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation" and that "other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(1)-(2).

16.     In the ESA, Congress established "a program for the conservation of such endangered species and threatened species" and mandated federal agencies to "utilize their authorities in furtherance of the purposes of" the ESA by committing "to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction . . . ." 16 U.S.C. § 1531(a)(4), (b), (c)(1).

17.     The ESA defines the term "conserve" to mean "to use all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary." 16 U.S.C. § 1532(3).

18.     Before a species receives any protection under the ESA, FWS must list the species as either "threatened" or "endangered," based on a scientific evaluation of threats to the species' continued existence. 16 U.S.C. § 1533(a), (c).

19.     African elephants and lions in Zimbabwe are currently listed as "threatened species," i.e., species that are "likely to become an endangered species within the foreseeable future through all or a significant portion of [their] range." 16 U.S.C. § 1532(20); 50 C.F.R. § 17.11(h); 80 Fed. Reg. 79,999 (Dec. 23, 2015); 43 Fed. Reg. 20,499 (May 12, 1978).

20.     Once a species is listed under the ESA, the law affords it several protections. The import of endangered species is automatically prohibited under Section 9 of the ESA, unless such activity is "for scientific purposes or to enhance the propagation or survival of the affected species . . . ." 16 U.S.C. §§ 1538(a)(1)(A), 1539(a)(1)(A). The legislative history of the ESA clarifies that the issuance of enhancement permits was intended to be extremely limited in scope and that it would only allow an otherwise strictly prohibited activity where necessary to benefit the species in the wild. *See, e.g.*, H. Rep. No. 412, 93d Cong., 1st Sess. 17 (July 27, 1973), reprinted in A Legislative History of the Endangered Species Act of 1973, 97th Cong., 2d Sess. (February 1982) at 156 ("[a]ny such activities to encourage propagation or survival may take place in captivity, in a controlled habitat or even in an uncontrolled habitat so long as this is found to provide the most practicable and realistic opportunity to encourage the development of the species concerned"). The legislative history further explains that such activities "might even,

in extraordinary circumstances, include the power to cull excess members of a species where the carrying capacity of its environment is in danger of being overwhelmed." *Id*.

21.     In issuing enhancement permits, FWS generally considers factors such as: "[t]he probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;" "[w]hether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;" and "[w]hether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit." 50 C.F.R. § 17.22(a)(2). These same criteria generally apply to threatened species as well as endangered species. *Id*. § 17.32(a)(2).

22.     For threatened species, Section 4(d) of the ESA provides:

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538 (a)(1) of this title [i.e., Section 9] . . . 16 U.S.C. § 1533(d).

23.     In other words, the Service must issue regulations to conserve threatened species and may extend the statutory protections afforded to endangered species to threatened species. The Service has issued a default regulation providing that threatened species receive the same protection as endangered species, unless a species-specific regulation applies. 50 C.F.R. § 17.31. Both African elephants and lions are subject to such species-specific regulations. *Id*. § 17.40(e), (r).

24.     In 2016, the Service amended the 4(d) rule for African elephants. 81 Fed. Reg. 36,387 (June 6, 2016). The new regulation strictly regulates trade in ivory, including restricting

the number of elephant tusks that may be imported as trophies each year by a hunter (to discourage laundering of trophies for commercial trade) and requiring ESA permits for all trophy imports regardless of the country of origin. 81 Fed. Reg. at 36,418.

25.     The Service is now required to determine whether a particular applicant seeking to import an elephant trophy from Zimbabwe has demonstrated that the hunt has positively benefited the conservation of the species. 50 C.F.R. § 17.40(e)(6) ("African elephant sport-hunted trophies may be imported into the United States provided: (A) The trophy was legally taken in an African elephant range country that declared an ivory export quota to the CITES Secretariat for the year in which the trophy animal was killed; (B) A determination is made that the killing of the trophy animal will enhance the survival of the species and the trophy is accompanied by a threatened species permit issued under § 17.32; (C) The trophy is legibly marked in accordance with 50 CFR part 23; (D) The requirements in 50 CFR parts 13, 14, and 23 have been met; and (E) No more than two African elephant sport-hunted trophies are imported by any hunter in a calendar year.").

26.     Similarly, when the Service listed African lions in Zimbabwe (and other countries in southern and eastern Africa) as threatened, effective January 22, 2016, it issued a 4(d) rule providing that an ESA permit is required for each import of an African lion hunting trophy. 50 C.F.R. § 17.40(r). In adopting that regulation, the Service committed to making a determination of whether the import of lion hunting trophies "enhances the propagation or survival of *P. l. melanochaita,* [by] examin[ing] the overall conservation and management of the subspecies in the country where the specimen originated and whether that management of the subspecies addresses the threats to the subspecies (*i.e.,* that it is based on sound scientific principles and that the management program is actively addressing the current and longer term threats to the

subspecies). In that review, [the Service] will evaluate whether the import contributes to the overall conservation of the species by considering whether the biological, social, and economic aspects of a program from which the specimen was obtained provide a net benefit to the subspecies and its ecosystem." 80 Fed. Reg. at 80,045.

27.     For both species, the Service uses the standards established by the International Union for the Conservation of Nature ("IUCN") to determine the impacts of trophy hunting programs, focusing on evaluating (1) biological sustainability, (2) net conservation benefit, (3) socio-economic-cultural benefit, (4) adaptive management, and (5) accountable and effective governance. *Id.*; 81 Fed. Reg. 36,388, 36,394 (June 6, 2016).

28.     In sum, an African elephant or lion hunting trophy can only be issued if the Service determines that the killing and import of that threatened species enhances the survival of the species, meaning that the activity "must go beyond having a neutral effect and actually have a positive effect" on the species' conservation. U.S. Fish and Wildlife Service Handbook for Endangered and Threatened Species Permits (1996).

**B.     Convention on International Trade in Endangered Species of Wild Flora and Fauna**

29.     The Convention on International Trade in Endangered Species of Flora and Fauna ("CITES") is an international conservation treaty designed to ensure that international trade in animals and plants does not threaten their survival. T.I.A.S. No. 8249. The Convention recognizes that "wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems of the earth which must be protected for this and the generations to come." CITES, preamble (March 3, 1973).

30.     To receive protection under CITES, wildlife is first included on one of three CITES appendices, which provide the species varying degrees of protection. African elephants in

Zimbabwe and African lions are listed under Appendix II, which includes "species which although not necessarily now threatened with extinction may become so unless trade in specimens of such species is subject to strict regulation." CITES, Art. II para. 2(a).

31.     African elephants listed on Appendix II, including those in Zimbabwe, are regulated subject to an annotation. That annotation, among other things, allows for trade in hunting trophies for non-commercial purposes.

32.     Due to the previous elephant poaching crisis, CITES established and maintains unique monitoring programs for elephants. One of these programs is the Elephant Trade Information System ("ETIS"), which documents CITES' parties enforcement efforts and capabilities for enforcing the rule of law.

### C.     The Administrative Procedure Act

33.     The Administrative Procedure Act ("APA") provides for judicial review of final agency action for persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702.

34.     The APA authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

35.     If an agency changes a policy or legal interpretation from a previously-held position, the new policy or interpretation is arbitrary or capricious unless the agency displays awareness that it has changed position and provides a reasoned explanation for why it believes the new interpretation is better than its previous interpretation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

//

## FACTUAL BACKGROUND

**A.      African Elephants and Their Population Status**

36.      Elephants are highly intelligent, social animals who form strong, permanent social bonds with their family units.

37.      Elephants typically spend day-to-day in their immediate family unit or herd but migrate and seek resources encountering other elephant groups.

38.      In the wild, an elephant's home range is as much as 500 square miles, meaning that elephants routinely cross international boundaries, such as those between Zimbabwe and its neighboring countries such as Botswana, Zambia, and South Africa. These countries all share trans-boundary populations of elephants.

39.      Elephants walk long distances every day foraging and socializing with other elephants.

40.      Both male and female African elephants bear ivory tusks, which are used by the animals for myriad purposes.

41.      Ivory tusks have long been deemed desirable as personal trophies and for carvings and are deemed valuable by hunters and poachers.

42.      African elephants have suffered a catastrophic population decline of approximately 60 percent since 1978 when the species was first protected under the ESA as threatened. Today, there are hundreds of thousands fewer elephants in existence and elephant numbers continue to drop.

43.      The most comprehensive survey of African elephants – called the Great Elephant Census – indicates that an estimated 144,000 elephants were lost between 2007 and 2014 alone,

and populations are currently shrinking by 8 percent per year continent-wide, primarily due to poaching.

44.     In Zimbabwe, the elephant population is estimated to have decreased by six percent between 2001 and 2013 according to the Great Elephant Census and by approximately 18 percent between 2007 and 2013 according to the IUCN's African Elephant Specialist Group. This decline is significant, especially given the fact that African elephants reproduce very slowly and are being poached faster than they are being born. Such a precipitous loss of individuals threatens the continued existence of the species.

45.     A 2016 African Elephant Specialist Group report estimated Zimbabwe's elephant population at $82,630 \pm 8,589$, noting that poaching has "escalated in the past ten years" and become "a major problem in Zimbabwe."

46.     While Zimbabwe's elephant population faces an overall decline, regionally there are concerns. Serious population declines have been documented in two of the four main Zimbabwe elephant populations. In Sebungwe, the elephant population decreased by 74 percent, from about 11,000 to 4,000 elephants. And in Middle Zambezi, the population decreased by 40 percent, from about 18,000 to 11,500 elephants.



Figure 1. Zimbabwe's national elephant statistics, 2014. From The Zambezi Society Bulletin, February 2015 (http://us10.campaign-archive2.com/?u=f4943277ce971cb1c9028d068&id=50589e3c06).

47.     Poaching rates – whether for procurement of ivory or due to human-elephant conflict – are an on-going threat to elephants in Zimbabwe.

48.     The Great Elephant Census documented near eight percent carcass ratios in the country, meaning the survey recorded one dead elephant for every eight live elephants.

49.     Poaching by poison has been an on-going issue in Zimbabwe. More than 100 elephants were poisoned in 2013 and at least 14 elephants killed by poison near Hwange National Park in June of 2017.

**B.     African Lions and Their Population Status**

50.     Lions are highly intelligent, social animals who form strong, permanent social bonds with their family units.

51.     Lions live in groups called "prides," which are "fission-fusion" social units defined as a stable membership that can be divided into small groups throughout the range. Each pride has a territory of 20-500 km$^2$ depending on availability of prey, meaning that lions

routinely cross international boundaries, such as those between Zimbabwe and its neighboring countries including Botswana, Zambia, and South Africa. These countries all share trans-boundary populations of lions.

52.     Male lions disperse from their natal groups and form coalitions to take over a pride in order to reproduce. Upon takeover or demise of a previous male, it is to the new males' reproductive advantage to kill all the suckling cubs in the pride as this will cause the nursing lionesses to renter estrous within a few weeks, enabling the new males to sire offspring.

53.     For these reasons, scientific literature suggests that if any hunting is to be allowed, only male lions should be hunted and age restrictions should be imposed to ensure that hunters target males that are six years or older, as they may be less likely to be actively procreating and their loss may be less likely to spur infanticide events in lion prides.

54.     Male lions with large manes are targeted by trophy hunters, and lion bones are deemed commercially value for medicinal purposes in international trade.

55.     African lions are thought to number between 30,000 to 20,000, having suffered approximately a 43 percent population decline in the last 21 years.



From CMS Lion Listing Proposal by Chad, Niger, Togo, Figure 1

56. In Zimbabwe, in 2014 the IUCN estimated the lion population at roughly 703 lions.

57. In addition to threats from loss of habitat and prey and human-lion conflict, empirical data demonstrates that excessive offtake from trophy hunting has lowered population density of lions and altered sex-ratios of lions in Zimbabwe.

**C.     Trophy Hunting Impacts on Elephants and Lions**

58. Trophy hunters routinely target the biggest and strongest male lions and elephants, but removing these animals from the breeding pool unnaturally selects for smaller and weaker animals and reduces a population's reproductive capacity.

16

59.     By removing males in their prime from the population, trophy hunting can decrease genetic variation, shift the population structure, decrease population density, and cause unnatural evolutionary impacts (such as increasing the occurrence of mature elephants with no tusks).

60.     Additionally, due to instability created by removing dominant males, trophy hunting can have cascading lethal impacts on lion and elephant social groups.

61.     Trophy hunting of female African elephants, who also bear ivory, can destabilize social structures and cause loss of social knowledge.

62.     Further, when trophy hunting is sanctioned, poaching activity increases, likely due to the perception that species authorized for hunting are of diminished value and the perception that legal killing increases the acceptability of poaching.

63.     As little as 3-5 percent of trophy hunting revenues are shared with local communities or otherwise contribute towards disincentivizing poaching or protecting habitat.

64.     Further, while overall tourism in Zimbabwe and other African countries popular with trophy hunters is valued at between 2.8 and 5.1 percent of Gross Domestic Product ("GDP"), the total annual economic contribution of trophy hunters is at most an estimated 0.03 percent of GDP.

**D.     Zimbabwe Corruption and Wildlife Management Failures**

65.     Corruption is a major concern in Zimbabwe.

66.     This is an issue in particular because wildlife trade and trafficking are the fourth largest black market in the world, behind only narcotics, weapons, and humans. Thus, where corruption abounds so can illegal wildlife trade.

17

67.     Zimbabwe scored a 22 on Transparency International's 2016 Corruption Perception Index.

68.     The Index measures perceived levels of public sector corruption based on expert opinion and is based on a scale of 0 (highly corrupt) to 100 (very clean).

69.     The likelihood of a country being able to strictly manage a hunting program is significantly diminished when corruption is a problem.

70.     Additionally, the World Justice Project (WJP) Rule of Law Index 2016 ranked Zimbabwe 108 of 113 countries and jurisdictions, meaning that Zimbabwe has the sixth worst rule of law.

71.     In 2015, three Zimbabwe Parks and Wildlife Management Authority ("ZPWMA") staff members were arrested for involvement in the theft of ivory from a government stockpile held at Hwange National Park.

72.     At the time the elephant enhancement decision was announced, Zimbabwe's president was on house arrest amidst a military coup d'état.

73.     Zimbabwe's Communal Areas Management Programme for Indigenous Resources ("CAMPFIRE") program was designed to empower community members at a village level to control wildlife and associated revenue. However, CAMPFIRE has failed as a governance system for community involvement and empowerment, and revenue generated through elephant hunting does not actually benefit local communities or provide an incentive to conserve wildlife. For example, elephant populations of both Sebungwe and Gonarhezou where CAMPFIRE applies have experienced particularly dramatic elephant population declines in recent years.

### E.     Zimbabwe's Failure to Sustainably Manage Elephants

74.     Despite its elephant population continuing to decline every year since 2001, since 2004 Zimbabwe has refused to alter its African elephant export quota established under CITES.

75.     This export quota stands at 1,000 tusks from 500 animals exported as trophies.

76.     In 2015, Zimbabwe updated its 1996 and 1997 elephant management documents creating a new management plan that includes, among other things, an outline for managing elephant hunting.

77.     The plan includes five key components: protection and law enforcement; biological monitoring and management; social, economic and cultural framework; building conservation capacity; and coordination, collaboration and program management.

78.     The plan also includes development of a management plan for the four key elephant populations: Northwest Matabeleland (a.k.a. Hwange area); Sebungwe; mid-Zambezi Valley; and South East Lowveld (a.k.a. Gonarezhou area).

79.     The plan denotes the need for $12 million per year for operational costs alone.

80.     Despite its recognition of significant elephant poaching in Sebungwe and Middle Zambezi, the plan still authorizes elephant hunting in these areas.

81.     The plan details the need for reporting of the age, sex, and size of elephants hunted.

82.     The U.S. is by far the leading importer of African elephant parts as hunting trophies.

83.     According to trade data compiled by the Service, from 2003-2014, trophies of over 10,000 African elephants were imported into the U.S. More than 40 percent of those trophies were sourced from Zimbabwe.

84.     Zimbabwe's negative corruption ranking has had adverse implications for its enforcement metrics. The CITES 2016 ETIS report noted that Zimbabwe pulled the rule of law score down. The same report also raised concerns with Zimbabwe's ivory carving industry.

**F.     Zimbabwe's Failure to Sustainably Manage Lions**

85.     Between 2005 and 2014, American trophy hunters imported 411 lion trophies from Zimbabwe.

86.     Zimbabwe has a 2006 lion management plan that was drafted in coordination with trophy hunters. Zimbabwe has not updated its lion management plan since 2006.

87.     The plan has three main objectives: the persistence of key and other lion populations; reduction of human and livestock loss; and optimization of wildlife conservation-related net benefits to local communities.

88.     To achieve these objectives, the 2006 plan delineated seven outputs, none of which have been completed as of 2017.

89.     The plan also delineated 108 necessary conservation activities, but available documentation indicates that only 26 of those activities have been completed.

90.     The plan authorizes the hunting of lions, including male lions that are currently affiliated with prides and siring cubs, despite ample scientific evidence that hunting male lions causes social instability that has cascading lethal impacts on lion populations.

91.     The 2006 plan does not prohibit the hunting of female lionesses, despite the fact that removing females has a severe negative impact on the reproductive capacity of lion populations.

92.     Lion hunting quotas for each year are determined by a point system based off of the hunts from the previous season, creating a financial incentive to misrepresent information about lions killed during a season.

93.     Lions that attack livestock are lethally eliminated.

94.     Zimbabwe does not provide funding for lion conservation through its central treasury, creating an unsustainable dependency on trophy hunting for revenue.

**G.     FWS's 2014 and 2015 Findings Prohibiting Imports of Elephants from Zimbabwe**

95.     Beginning in 2014 (and extended indefinitely in 2015), the Service determined that hunting African elephants in Zimbabwe does not enhance the survival of the species. *See* 79 Fed. Reg. 44,459 (July 31, 2014); 80 Fed. Reg. 42524 (July 17, 2015).

96.     Those findings concluded that there are numerous problems with Zimbabwe's elephant management scheme: the lack of an elephant management plan; lack of sufficient data on population numbers and trends on which to base management decisions; weak implementation and enforcement; lack of evidence that legal offtake is biologically sustainable, taking into account illegal offtake; lack of information about how money from trophy hunting by U.S. hunters is distributed within Zimbabwe; and lack of a national mechanism, such as government support, to sustain elephant conservation efforts in the country.

97.     The findings specifically concluded that both elephant population declines and increased poaching are occurring in CAMPFIRE areas.

98.     The findings raised questions about the 1996 and 1997 elephant management plans in place, but noted the 1996 plan provided that the "sport hunting quota should be reduced, to zero if necessary, if more than 0.75% of the population is being killed in other ways."

99.     The 2014 finding noted "it is vital" to have population estimates or trends upon which to base management decisions. The findings found that updated population estimates were lacking for Zimbabwe and anticipated updated data from the Great Elephant Census on both population estimates and carcass ratios.

100.     The 2015 finding reported the preliminary results of the Great Elephant Census of Zimbabwe, estimating the population between 82,000 and 83,000 elephants – a six percent decline since the 2001 surveys.

101.     The 2015 finding further reported preliminary carcass counts from the Census as follows:  approximately 553 carcasses in Mid Zambezi Valley (4.3% of live population); approximately 1,424 carcasses in Sebungwe (28.2%); approximately 4,087 carcasses in North West Matabeleland (7.6%); and approximately 523 carcasses in Gonarezhou National Park (4.6%).

102.     The 2014 and 2015 findings question a 2013 carcass ratio of four percent for Gonarezhou National Park as "unrealistically low" given that natural mortality is generally in-and-of-itself four percent and poaching was a significant contributor to mortality.

103.     The 2014 and 2015 findings further noted that the failure to properly protect elephants in Zimbabwe led to a significant decline in the elephant population, including large-scale poisoning of elephants at watering holes, and expressed concern about the long-term survival of elephants in Zimbabwe.

104.     These findings prohibited the issuance of import permits for trophies of elephants killed during those calendar years.

105.     Hunting organizations challenged the 2014 and 2015 findings in court.

106.    The District Court upheld the 2014 and 2015 findings for Zimbawe. *Safari Club Int'l v. Jewell*, 213 F. Supp. 3d 48 (D.D.C. 2016).

107.    The hunting organizations appealed and the appeal has been briefed and argued and is pending before the D.C. Circuit.

**H.    FWS's 2016-2018 Zimbabwe Elephant Finding**

108.    Following the Service's suspension of elephant imports from Zimbabwe, U.S. trophy hunting advocates worked with Zimbabwe in seeking reversal of the decision.

109.    While the facts have not changed on the ground, the Service provided notice of a new finding dated November 16, 2017 ("Elephant Finding") that concluded that hunting elephants in Zimbabwe enhances the survival of the species. 82 Fed. Reg. 54405 (Nov. 17, 2017).

110.    The Elephant Finding is based on information submitted by the Government of Zimbabwe, hunting organizations, and others since 2014. The Elephant Finding claims to be based on comments received from interested parties, yet Plaintiffs were not given an opportunity to comment on the Elephant Finding.

111.    The Elephant Finding is based on various pieces of information submitted by the Government of Zimbabwe throughout 2016 and 2017 but is backdated to January 21, 2016 allowing import of elephant trophies from this date through December 31, 2018.

112.    The new Elephant Management Plan upon which the Elephant Finding relies acknowledges that it "'is an ambitious plan' and that the implementation would 'require more human and financial resources than are currently available for the conservation and management of elephants in Zimbabwe.'"

113.    FWS also finds that "that Zimbabwe does not currently have sufficient resources to fully implement the" Elephant Management Plan.

114.    The Elephant Finding also notes that ZPWMA provides law enforcement functions associated with controlling and maintaining wildlife resources, but that the ZPWMA receives no significant government funding.

115.    After FWS expressed concern over whether adequate resources were available to implement the Elephant Management Plan, the ZPWMA provided a "supplemental" elephant management plan by letter dated November 8, 2016.

116.    This supplement allegedly provides a short list of priorities for elephant management.

117.    The Elephant Finding determines that ZPWMA is "making an effort to make progress toward" implementation of the Elephant Management Plan.

118.    FWS suggests that Zimbabwe has revised elephant population data for 2015, but the Elephant Finding neither discloses this population information nor how the surveys were conducted relying instead upon elephant population data from the Great Elephant Census in 2014 and the African Elephant Specialist Group in 2016.

119.    The 2017 report for the CITES Standing Committee found that Zimbabwe's elephant population is continuing to decline.

120.    The Elephant Finding notes "evidence of corruption or collusion within the wildlife sector" and provides as an example the loss of rhino horns from a government stockpile.

121.    As in its earlier findings, the Elephant Finding questions why Zimbabwe maintains the same CITES export quota, of 500 elephants or 1,000 tusks year to year, but nevertheless accepts this situation noting this issue will be revisited in the 2018 finding.

122.    The Elephant Finding relies upon an estimate of 215 elephants being killed for trophies per year in approximating annual mortality of elephants in Zimbabwe.

123.    This estimate is from 2015 when U.S. hunters, roughly 54 percent of those who hunt in the country, could not import elephant trophies.

124.    The Elephant Finding indicates Zimbabwe set an internal quota for 2016 of 400 elephants.

125.    The Elephant Finding does not indicate what the 2017 elephant quota will be but Zimbabwe has reported a quota to CITES of 500 elephants.

126.    The Elephant Finding does not indicate what the 2018 elephant quota will be in Zimbabwe.

127.    The Elephant Finding states that Zimbabwe's Parks and Wildlife Act devolved authority to manage wildlife on private and communal land to the landholder, pursuant to the CAMPFIRE program established in 1989.

128.    The Elephant Finding estimates annual loss/mortality of elephants from different causes in Zimbabwe – putting the number at about two percent from all sources but says nothing about annual recruitment.

129.    The Elephant Finding estimates annual loss of elephants due to poaching noting in 2009 and 2010 on average 111 elephants were poached, between 2011 and 2013 the average "more than doubled to 243 elephants" although the 2013 estimate was then raised to 293 and declined to 194 in 2014.

130.    The Elephant Finding notes that, according to ZPWMA, 11 live elephants were exported in 2012 and 2014, but that the CITES trade database documents the export of 18 live elephants in 2012 and 27 in 2015.

131.    The Elephant Finding accepts Zimbabwe's assertion that three of the four primary elephant areas "exceed desired density" despite the fact that in one of these areas (Middle Zambezi) the elephant population decreased by 40 percent.

132.    The Elephant Finding determines that 54 percent of the hunting market in Zimbabwe is made up of U.S. hunters and elephant hunting is a big attraction for these hunters.

133.    The Elephant Finding lists seven items – ranging from elephant management plan implementation to provision of population information – for further consideration.

134.    Despite the lack of evidence demonstrating Zimbabwe is implementing its new elephant plan, continued elephant population decline, significant remaining corruption concerns, and other evidence and information before the Service, the Service erroneously concluded that elephant hunting in Zimbabwe enhances the survival of the species.

     **I.**     **FWS's 2016-2018 Zimbabwe Lion Finding**

135.    For the first time following FWS' decision to list African lions as a threatened species, on October 11, 2017, the Service announced that it made a positive enhancement finding and would allow the import of African lion trophies hunted in Zimbabwe in calendar years 2016, 2017, and 2018 ("Lion Finding").

136.    The Lion Finding is based primarily on information submitted by the Government of Zimbabwe in October 2016 – without application of independent scientific scrutiny – yet the Lion Finding is backdated to January 22, 2016.

137.    The Lion Finding claims to be based on comments received from interested parties, yet Plaintiffs were not given an opportunity to comment on the Lion Finding.

138.    The Service concedes that to sustainably manage wildlife and determine the impacts of trophy hunting, it is vital to possess sufficient data on population numbers and trends.

139.    The lion population estimate included in the Lion Finding is more than 16 percent inflated from the numbers included in the source document from Zimbabwe that the Service relied on in making the Lion Finding, which demonstrates that fewer than 300 truly wild adult male lions remain in the country.

140.    The Service acknowledges that is has no evidence that lion population surveys have been conducted in Zimbabwe since 2015.

141.    The Lion Finding acknowledges that lion population density is directly related to prey density, and that prey species have declined in recent years due to drought in Zimbabwe.

142.    The Lion Finding notes that there is a significant threat to lions from habitat loss in Sebungwe and the South East Low Veld in Zimbabwe, where increasing human and livestock populations encroach on lion habitat.

143.    The Lion Finding acknowledges that international trade in lion parts and products is emerging as an additional threat to the species, that there are no records of enforcement actions taken for possession of illegally acquired lion specimens in Zimbabwe, and that the extent of the lion part trade in Zimbabwe is unclear.

144.    The Lion Finding states that while ZPWMA provides law enforcement functions associated with controlling and maintaining wildlife resources, but that it receives no significant government funding.

145.    The Service concedes that the Lion Finding is based on an outdated 2006 management plan that must be updated based on ample scientific developments since its adoption.

146.    The Lion Finding acknowledges that while Zimbabwe claims to have a management plan specifically for Hwange National Park, no such plan has been produced to the Service.

147.    The Lion Finding only analyzes three of seven outputs of Zimbabwe's plan, ignoring evidence demonstrating a lack of progress toward meeting the stated targets and undertaking the stated activities in the plan.

148.    The Lion Finding states that Zimbabwe applies age-based restrictions on lion hunting, but the Service acknowledges that those age restrictions are not fully implemented or enforced, and that those restrictions do not apply in CAMPFIRE areas where lion trophy hunting occurs.

149.    The Lion Finding concedes that Zimbabwe is not applying the best available science on age restrictions, allowing lions five years of age to be hunted and exported.

150.    The Lion Finding concedes that age-based restrictions are not sufficiently enforced, as more than 20 percent of lions hunted in Zimbabwe in 2015 were under the age of five.

151.    Zimbabwe sets lion quotas through a workshop involving trophy hunters (who have a self-interest in such quotas), not by applying the best available science. Even when the workshop does not yield enough information to set a quota, a "precautionary quota" is nevertheless issued to allow lion hunting.

152.    The Lion Finding's conclusion that Zimbabwe's lion hunting quota is sustainable is based on inflated population estimates.

153.    Outside of the quota, hunting concessionaires are allowed to buy additional animals, and the Service acknowledges that it is unclear how many animals are allowed to be so purchased or how Zimbabwe ensures that such a process does not exceed the national quota.

154.    The Lion Finding states that U.S. hunters account for 51 percent of the revenue derived from hunting across the country and 72 percent of the lion hunting (including 90 percent of the revenue from lion hunting in Babuye and Save).

155.    Despite the substantial flaws in Zimbabwe's lion management program and other evidence and information before the Service, the Service erroneously concluded that lion hunting in Zimbabwe enhances the survival of the species. The agency concludes that "the harvest and import of sport-hunted trophies of lions within Zimbabwe meet the purposes of the ESA."

## CLAIMS FOR RELIEF

## FIRST CLAIM

**FWS Acted Arbitrarily and Capriciously in Issuing the 2016-2018 Enhancement Finding for Zimbabwe Elephants in Violation of the APA**

156.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

157.    To make a positive enhancement finding for African elephants under the ESA, the Service must evaluate: the range country's management plans to determine if the overall conservation and management of the species is based on sound scientific principles as well as reviewing the animal population at issue and its status, the regulatory system and enforcement thereof, and specifically how hunting is managed in the country.

158.    The Service may issue an enhancement finding if, among other things, the best available science supports a conclusion that the management plan actively addresses the current and long term threats to the species and thus affirmatively benefits the survival of the species.

29

Here the Service finds that Zimbabwe lacks the resources to implement its new Elephant Management Plan but nevertheless relies upon implementation of that plan ignoring copious scientific evidence demonstrating that the management of elephants in Zimbabwe fails to adequately protect the species.

159. The Service may issue an enhancement finding if, among other things, it can evaluate the population and trends of the species over time to discern the impacts of trophy hunting and ensure that monitoring of the population and cross-border conservation are occurring. Here, this information was lacking yet FWS nevertheless makes a positive finding despite failing, among other things, to: indicate births/recruitment into the elephant population; provide updated population estimates; accurately estimate annual mortality; or provide a rational discussion of the impacts of trophy hunting that considers all relevant factors.

160. The Service's conclusions in the enhancement finding are belied by the record and are arbitrary and capricious and not in accordance with law, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

161. Additionally, in issuing its 2017 Elephant Finding, FWS departs from its 2014 and 2015 elephant findings without explanation, including by failing to adequately explain why obtaining funding from only trophy hunting was a concern in 2014-2015 but is not a concern now; how Zimbabwe has addressed corruption in its wildlife sector when poaching is still on-going and the country's corruption index is incredibly weak; and how a new elephant management plan coupled with insufficient resources to implement it, especially in light of the coup d'état, created change on the ground from the 1996 and 1997 plans.

162. The Service has failed to explain this policy reversal and such action is arbitrary and capricious and not in accordance with law, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

163. Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## SECOND CLAIM

### In Issuing the 2017 Elephant Findings FWS Acted Contrary to Law

164. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

165. The Service's decisions to allow the import of hunting trophies from African elephants hunted in Zimbabwe in calendar years 2016, 2017, and 2018 undermines the conservation of this threatened species and thus is contrary to the conservation mandate of the Endangered Species Act and the Act's requirement that prohibited activities "enhance" the survival of the species and the findings are not in accordance with law under the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

166. Defendant's violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## THIRD CLAIM

### FWS Acted Arbitrarily and Capriciously in Issuing the 2016-2018 Enhancement Finding for Zimbabwe Lions in Violation of the APA

167. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

31

168.    To make a positive enhancement finding for African lions under the ESA, the Service must evaluate the range country's management plans to determine if the overall conservation and management of the species is based on sound scientific principles as well as reviewing the animal population at issue and its status, the regulatory system and enforcement thereof, and specifically how hunting is managed in the country.

169.    The Service may issue an enhancement finding if, among other things, the best available science supports a conclusion that the management plan actively addresses the current and long term threats to the species and thus affirmatively benefits the survival of the species. Here the Service ignored copious scientific evidence demonstrating that the management of lions in Zimbabwe fails to adequately protect the species and that trophy hunting is unsustainable and poses a threat to the survival of the population.

170.    The Service may issue an enhancement finding if, among other things, it can evaluate the population and trends of the species over time to discern the impacts of trophy hunting and ensure that monitoring of the population and cross-border conservation are occurring. Here, this information was lacking yet FWS nevertheless makes a positive finding despite failing, among other things, to: indicate births/recruitment into the lion population; provide updated population estimates; accurately estimate annual mortality; or provide a rational discussion of the impacts of trophy hunting that considers all relevant factors.

171.    The Service's conclusions in the enhancement finding are belied by the record and are arbitrary and capricious and not in accordance with law, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

172.    Additionally in issuing its 2017 Lion Finding, FWS departs from its 2014 and 2015 elephant findings without explanation, including by failing to adequately explain why

obtaining funding from only trophy hunting was a concern in 2014-2015 but is not a concern now; or how Zimbabwe has addressed corruption in its wildlife sector.

173.    The Service has failed to explain this policy reversal and such action is arbitrary and capricious and not in accordance with law, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

174.    Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## FOURTH CLAIM

### In Issuing the 2017 Lion Findings FWS Acted Contrary to Law

175.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

176.    The Service's decisions to allow the import of hunting trophies from African lions hunted in Zimbabwe in calendar years 2016, 2017, and 2018 undermines the conservation of this threatened species and thus is contrary to the conservation mandate of the Endangered Species Act and the Act's requirement that prohibited activities "enhance" the survival of the species and the findings are not in accordance with law under the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

177.    Defendant's violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests this Court:

A. Declare that Defendants' November 16, 2017 enhancement determination regarding Zimbabwe elephants violates the APA and is counter to the ESA;

B. Declare that Defendants' October 11, 2017 enhancement determination regarding Zimbabwe lions violates the APA and is counter to the ESA;

C. Declare that Defendants unlawfully changed their position from the 2014 and 2015 non-enhancement determinations without the required rational explanation for the agency's change in position;

D. Declare that it would be unlawful for Defendants to issue any import permits for African elephant or African lion trophies from Zimbabwe pursuant to these unlawful findings;

E. Set aside and remand the challenged Zimbabwe enhancement findings;

F. Award Plaintiffs their fees and costs; and

G. Grant Plaintiffs such other relief as the Court deems just and proper.

DATED:  November 20, 2017                  Respectfully submitted,

/s/ Tanya M. Sanerib
Tanya M. Sanerib (D.C. Bar No. 473506)
Telephone: (206) 379-7363
tsanerib@biologicaldiversity.org

Sarah Uhlemann (D.C. Bar No. 501328)
Phone: 206-327-2344
suhlemann@biologicaldiversity.org
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117

*For Plaintiffs*