**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Center for Biological Diversity, et al.,

*Plaintiffs,*

v.

Civ. No. 1:17-cv-02504-RCL

Ryan Zinke in his official capacity as Secretary of the
U.S. Department of the Interior, et al.,

*Defendants,*

Safari Club International, et al.,

*Intervenor-Defendants.*

**SECOND AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Introduction**

1.      Elephants in Africa have suffered catastrophic population declines in recent years

as they are targeted for their valuable ivory tusks. Nevertheless, the Secretary of the Interior and

the U.S. Fish and Wildlife Service ("FWS" or "the Service") have unjustifiably reversed course

and eliminated critical protections established just two years ago that prohibited the import of

hunting trophies from African elephants killed in Zimbabwe. This agency action from November

2017 – predicated on an erroneous finding that the government of Zimbabwe has the capacity to

sustainably manage elephant hunting – came in the midst of a Zimbabwean coup d'état.

Simultaneously, for the first time since listing African lions as threatened under the Endangered

Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, the Service made an unsupported finding that the

trophy hunting of lions in Zimbabwe somehow meets the stringent conservation requirements of

our nation's cornerstone wildlife protection statute. Following on the heels of the death of the

1

now famous lion Cecil in Zimbabwe, the decision to sanction lion hunting by U.S. hunters raises serious conservation concerns that FWS itself voiced when it listed lions as threatened two years ago.

2.      These two final agency actions are arbitrary and capricious, as the conclusions that trophy hunting of elephants and lions in Zimbabwe enhances the survival of the species are not supported by the evidence in the administrative record. The decisions undermine the agency's statutory duty to promote the conservation of species threatened with extinction and thus are not in accordance with law. Further, the government has failed to rationally explain its 180 degree turn from determining that Zimbabwe is incapable of managing elephant hunting sustainably, to proclaiming open season on elephants and lions in Zimbabwe, a top destination for American trophy hunters due to lax regulations exacerbated by rampant corruption.

3.      After issuing these arbitrary country-wide enhancement findings for elephant and lion trophy imports from Zimbabwe, FWS issued a memorandum on March 1, 2018, one part of which purported to withdraw the challenged enhancement findings, along with all other elephant and lion country-wide enhancement findings for trophy imports from Africa. However, the memorandum also indicated the Service's intent to continue to rely on the information in these findings in making future permitting decisions. In issuing the March 2018 memorandum, the Service failed to comply with rulemaking procedures in addressing these prior legislative rules and establishing a new policy of issuing elephant and lion enhancement findings on a case-by-case basis, ignoring the holding by the U.S. Court of Appeals for the District of Columbia. *Safari Club Int'l, et al. v. Zinke, et al.*, 878 F.3d 316 (D.C. Cir. 2017) ("*Zimbabwe I*").

4.      Therefore, Plaintiffs – conservation organizations and a local safari guide with vested interests in the protection of elephants and lions in Africa – seek judicial review of these

flawed decisions pursuant to the Administrative Procedure Act. They respectfully ask this court

to declare that these decisions are unlawful and violate the Administrative Procedure Act and

Endangered Species Act and Defendants shall not issue any elephant or lion trophy import

permits unless it undertakes rulemaking on enhancement findings; and should grant Plaintiffs

their fees and costs and such other relief as is necessary.

## JURISDICTION AND VENUE

5.      This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 551-559,

701-706.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and

can grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202.

7.      Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e), as

this civil action is brought against officers and employees of the United States acting in their

official capacities and under the color of legal authority, a substantial part of the events giving

rise to the claim occurred in the District of Columbia, no real property is involved in this action,

and several Plaintiffs maintain offices or reside in this judicial district.

## PARTIES

8.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-

profit Internal Revenue Service Code Section 501(c)(3) corporation that works through science,

law, and policy to secure a future for all species, great or small, hovering on the brink of

extinction.  The Center is actively involved in species and habitat protection issues and has more

than 58,000 members throughout the United States and the world.  The Center is headquartered

in Tucson, Arizona, with offices in Washington, D.C.; San Francisco, Joshua Tree, and Los

Angeles, California; St. Petersburg, Florida; Portland, Oregon; Silver City, New Mexico;

Richmond, Vermont; Minneapolis and Duluth, Minnesota; and Seattle, Washington. The Center

brings this action on its own institutional behalf, and on behalf of its members who derive

scientific, aesthetic, recreational, and spiritual benefits from elephants, lions, and their habitat.

For example, Center member Brett Hartl has enjoyed photographing, observing, and searching

for elephants and lions in populations that cross between Zimbabwe and neighboring nations.

Additionally, Mr. Hartl has visited Tanzania, South Africa, Namibia, Botswana, and other

African countries to see African savannah elephants and African lions. Mr. Hartl plans to

continue these activities in the future, including specific plans to visit Zimbabwe this summer

and plans to visit Tanzania in 2019. Center members' aesthetic and professional interests, such as

Mr. Hartl's, are harmed by FWS' decision to allow U.S. imports of elephants and lions in

Zimbabwe. The Center advocates on the federal and international level for increased protections

for African elephants and lions, including a pending petition to list both forest and savannah

elephants in Africa as endangered and commenting on management plans for the species.

9.      Plaintiff HUMANE SOCIETY INTERNATIONAL ("HSI") is a global non-profit

organization, headquartered in Washington, D.C., with offices and programs around the world.

HSI works to protect animals from abuse, including wildlife trafficking and trophy hunting, and

has expended substantial organizational resources advocating for increased protection of

elephants and lions by FWS. HSI successfully petitioned FWS to list African lions as a

threatened species and has a pending petition to apply the most stringent prohibitions on import

of elephant trophies. HSI actively advocates at the state, federal, foreign, and international level

against unsustainable trade in wildlife parts and products and regularly monitors the import and

export of wildlife specimens. HSI also works with local authorities in African range states to

improve management and protection of elephants and lions, for example implementing a

4

program to administer contraception to wild elephant populations that were previously

slaughtered in herds in South Africa; partnering with local organizations in Zimbabwe to educate

the public about humane wildlife management and protest the sale of elephants to China; funding

to a local Tanzanian organization to support an anti-poaching radio broadcasting program; and

partnering with a local organization in Namibia to reduce human-wildlife conflict and oppose

trophy hunting. HSI further works to decrease demand for trade in elephant and lion parts and

products for commercial sale and medicinal use. The recreational killing of these animals by

hunters undermines these efforts by normalizing lethal activities.

10.     Plaintiff THE HUMANE SOCIETY OF THE UNITED STATES ("HSUS"), a

non-profit organization headquartered in Washington, D.C., has, on behalf of its members who

are personally vested in ensuring the continued survival of some of the world's most iconic

imperiled species, worked for decades to improve the plight of African wildlife, for example,

petitioning FWS to list elephants, lions, leopards, and chimpanzees as endangered in order to

curtail the import of hunting trophies and the domestic trade in such wildlife, and commenting in

opposition to hundreds of permit applications to import endangered species trophies or to kill

endangered species in the U.S. HSUS members' aesthetic and professional interests are harmed

by FWS' decision to allow U.S. imports of elephants and lions in Zimbabwe. By example,

Audrey Delsink lives and works in South Africa, dedicating her career to protecting elephants

and lions from trophy hunting and other threats and has scheduled plans to visit Zimbabwe this

year to see wild elephants and lions. Similarly, Ms. Delsink partners with an organization in

Namibia that works to reduce human-lion conflict and visited there in 2017 and has plans to

return to see lions. These interests would be undermined if the hunting of these species is

facilitated by FWS' decision to allow the import of elephant and lion trophies.

11.     Plaintiff IAN MICHLER has over 25 years of experience working as a specialist guide, photo-journalist, and ecotourism consultant across Africa. For 14 years he was based in the Okavango Delta, Botswana, and he has and continues to guide safaris in Zimbabwe, South Africa, Zambia, Namibia, Mozambique, and Tanzania to view elephants, lions, and other species for his business, Invent Africa. Mr. Michler is part of a global leadership team that seeks to bring an end to lion breeding for captive hunting and his guiding experience covers big game, birding, conservation, photographic, cultural, and adventure safaris. Mr. Michler's aesthetic and financial interests will be harmed by the FWS decision to allow U.S. hunters to import lion and elephant trophies from Africa.

12.     Plaintiff BORN FREE USA ("BFUSA"), a non-profit organization headquartered in Maryland, is a global leader in animal welfare and wildlife conservation. BFUSA leads vital legal and policy campaigns against, among other topics, the destructive international wildlife trade (and trafficking of elephant ivory in particular) and barbaric practice of trophy hunting (including the importing of elephant and lion trophies). BFUSA, on behalf of its members who engage in compassionate conservation of some of the world's most imperiled species, successfully petitioned the Department of the Interior to list lions as endangered under the Endangered Species Act, and has been one of the leading proponents (also successfully) to afford protections to African lions and elephants under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). BFUSA's members' aesthetic and professional interests are harmed by FWS' decision to allow U.S. imports of elephants and lions from Africa. By example, internationally renowned wildlife expert Will Travers OBE, who has been personally involved in rescuing elephants and lions, has been to Zimbabwe, South Africa, Zambia, and Tanzania previously and is planning to do so again to see wild elephants and lions,

and this interest would be undermined if the hunting of these species is facilitated by FWS' decision.

13.     The interests of Plaintiffs and their members are harmed by the challenged FWS decisions authorizing the importation of elephant and lion trophies. Further, Plaintiffs and their members are harmed by FWS' failure to comply with procedural requirements for withdrawing enhancement findings for elephant and lion imports and establishing a new policy of making such findings on a case-by-case basis rather than country-wide. Plaintiffs and their members devote substantial recreational time viewing, enjoying, studying, and photographing African elephants and lions. The interests of Plaintiffs and their members are threatened by the challenged FWS decisions, which will result in an increase of elephants and lions killed for recreational purposes, put unsustainable pressure on these imperiled populations, diminish Plaintiffs' and their members' ability to enjoy these majestic animals in the wild, and deprive Plaintiffs and members of the public of the opportunity to meaningfully participate in the establishment of new agency policy in this arena. Plaintiffs and their members have visited and will continue to visit Zimbabwe, South Africa, Zambia, Namibia, Mozambique, and Tanzania and/or trans-boundary parks that share elephant and lion populations with these countries to view, photograph, enjoy, and study elephants and lions. The challenged FWS decisions harm Plaintiffs and their members' interests in observing and enjoying elephants and lions. This is the case in countries in Africa that allow trophy hunting and in Zimbabwe and surrounding areas in particular because it will result in more elephants and lions being killed. U.S. sport hunters remove approximately "54 percent" of the wildlife hunted for trophies in Zimbabwe, which is primarily elephants but also includes "72 percent" of the lions that can be exported as trophies from Zimbabwe. U.S. trophy hunters killed approximately 3,867 elephants and 5,683 lions in

Africa between 2007-2016 alone, and the United States has long been the largest importer of such trophies.

14.     The challenged decisions also mean that in order to monitor and curtail trophy imports Plaintiffs have to redouble their use of limited organizational resources to obtain copies of applications to import elephant and lion trophies – since these applications are not published in the Federal Register and are not timely released in compliance with the Freedom of Information Act – and dedicate organizational resources tracking these permit applications and enhancement findings. Plaintiffs must also dedicate time and resources to tracking down country of origin management plans and understanding their implementation (or lack thereof), reviewing scientific literature and collecting other information on population status of hunted species, and researching the current regulatory and enforcement regime and tracking illegal activities. Due to the March 1 memorandum, Plaintiffs will have to even more routinely provide information to the Service regarding the status of wildlife, its management, and other scientific and regulatory information related to trophy imports to ensure the agency considers this information as it reviews and considers trophy import applications. And Plaintiffs will have to spend even more time attempting to get information under the Freedom of Information Act to track the Service's decisionmaking process.

15.     Defendant RYAN ZINKE, United States Secretary of the Interior, is the highest-ranking official within the U.S. Department of the Interior, and in that capacity, has ultimate responsibility for the administration and implementation of the ESA with regard to terrestrial endangered and threatened species, and for compliance with all other federal laws applicable to the Department of the Interior. Secretary Zinke is sued in his official capacity.

16.     Defendant DEPARTMENT OF THE INTERIOR is an agency of the federal government which is authorized to administer and implement the ESA.

17.     Defendant JIM KURTH is Acting Director and Deputy Director for Operations of the U.S. Fish and Wildlife Service, a federal agency within the Department of the Interior that is authorized and required by law to protect and manage the imperiled species protected under the ESA, to enforce and implement the Act, and for compliance with all other federal laws that apply to the Service. The Service has primary authority for day-to-day administration of the ESA with respect to terrestrial species. Acting Director Kurth is sued in his official capacity.

18.     Defendant GREG SHEEHAN is Principal Deputy Director of the U.S. Fish and Wildlife Service, a federal agency within the Department of the Interior that is authorized and required by law to protect and manage the imperiled species protected under the ESA, to enforce and implement the Act, and for compliance with all other federal laws that apply to the Service. The Service has primary authority for day-to-day administration of the ESA with respect to terrestrial species. Principal Deputy Director Sheehan is sued in his official capacity.

19.     Defendant the U.S. FISH AND WILDLIFE SERVICE is an agency or instrumentality of the United States, and is responsible for administering the provisions of the ESA with regard to threatened and endangered terrestrial species, including African elephants and lions. The Service's Division of Management Authority Branch of Permits in Falls Church, Virginia issued the enhancement findings, as approved by FWS headquarters in Washington, D.C., being challenged in this case.

//

## STATUTORY AND REGULATORY BACKGROUND

### A.      The Endangered Species Act

20.      The Endangered Species Act, 16 U.S.C. §§ 1531-1544, is the most comprehensive legislation for the preservation of threatened and endangered species ever enacted by any nation. In passing the Act, Congress found that different species "have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation" and that "other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(1)-(2).

21.      In the ESA, Congress established "a program for the conservation of such endangered species and threatened species" and mandated federal agencies to "utilize their authorities in furtherance of the purposes of" the ESA by committing "to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction . . . ." 16 U.S.C. § 1531(a)(4), (b), (c)(1).

22.      The ESA defines the term "conserve" to mean "to use all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary." 16 U.S.C. § 1532(3).

23.      Before a species receives any protection under the ESA, FWS must list the species as either "threatened" or "endangered," based on a scientific evaluation of threats to the species' continued existence. 16 U.S.C. § 1533(a), (c).

24.      African elephants and lions in Zimbabwe are currently listed as "threatened species," i.e., species that are "likely to become an endangered species within the foreseeable future through all or a significant portion of [their] range." 16 U.S.C. § 1532(20); 50 C.F.R. § 17.11(h); 80 Fed. Reg. 80,000 (Dec. 23, 2015); 43 Fed. Reg. 20,499 (May 12, 1978).

25.     Once a species is listed under the ESA, the law affords it several protections. The import of endangered species is automatically prohibited under Section 9 of the ESA, unless such activity is "for scientific purposes or to enhance the propagation or survival of the affected species . . . ." 16 U.S.C. §§ 1538(a)(1)(A), 1539(a)(1)(A). The legislative history of the ESA clarifies that the issuance of enhancement permits was intended to be extremely limited in scope and that it would only allow an otherwise strictly prohibited activity where necessary to benefit the species in the wild. *See, e.g.*, H. Rep. No. 412, 93d Cong., 1st Sess. 17 (July 27, 1973), reprinted in A Legislative History of the Endangered Species Act of 1973, 97th Cong., 2d Sess. (February 1982) at 156 ("[a]ny such activities to encourage propagation or survival may take place in captivity, in a controlled habitat or even in an uncontrolled habitat so long as this is found to provide the most practicable and realistic opportunity to encourage the development of the species concerned"). The legislative history further explains that such activities "might even, in extraordinary circumstances, include the power to cull excess members of a species where the carrying capacity of its environment is in danger of being overwhelmed." *Id*.

26.     In issuing enhancement permits, FWS generally considers factors such as: "[t]he probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;" "[w]hether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;" and "[w]hether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit." 50 C.F.R. § 17.22(a)(2). These same criteria generally apply to threatened species as well as endangered species. *Id*. § 17.32(a)(2).

11

27.     For threatened species, Section 4(d) of the ESA provides:

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538 (a)(1) of this title [i.e., Section 9] . . . 16 U.S.C. § 1533(d).

28.     In other words, the Service must issue regulations to conserve threatened species and may extend the statutory protections afforded to endangered species to threatened species. The Service has issued a default regulation providing that threatened species receive the same protection as endangered species, unless a species-specific regulation applies. 50 C.F.R. § 17.31. Both African elephants and lions are subject to such species-specific regulations. *Id.* § 17.40(e), (r).

29.     In 2016, the Service amended the 4(d) rule for African elephants. 81 Fed. Reg. 36,388 (June 6, 2016). The new regulation strictly regulates trade in ivory, including restricting the number of elephant tusks that may be imported as trophies each year by a hunter (to discourage laundering of trophies for commercial trade) and requiring ESA permits for all trophy imports regardless of the country of origin. 81 Fed. Reg. at 36,418.

30.     The Service is now required to determine whether a particular applicant seeking to import an elephant trophy from Africa has demonstrated that the hunt has positively benefited the conservation of the species. 50 C.F.R. § 17.40(e)(6) ("African elephant sport-hunted trophies may be imported into the United States provided: (A) The trophy was legally taken in an African elephant range country that declared an ivory export quota to the CITES Secretariat for the year in which the trophy animal was killed; (B) A determination is made that the killing of the trophy animal will enhance the survival of the species and the trophy is accompanied by a threatened species permit issued under § 17.32; (C) The trophy is legibly marked in accordance with 50

CFR part 23; (D) The requirements in 50 CFR parts 13, 14, and 23 have been met; and (E) No more than two African elephant sport-hunted trophies are imported by any hunter in a calendar year.").

31.     Similarly, when the Service listed African lions in  southern and eastern Africa as threatened, effective January 22, 2016, it issued a 4(d) rule providing that an ESA permit is required for each import of an African lion hunting trophy. 50 C.F.R. § 17.40(r). In adopting that regulation, the Service committed to making a determination of whether the import of lion hunting trophies "enhances the propagation or survival of *P. l. melanochaita,* [by] examin[ing] the overall conservation and management of the subspecies in the country where the specimen originated and whether that management of the subspecies addresses the threats to the subspecies (*i.e.,* that it is based on sound scientific principles and that the management program is actively addressing the current and longer term threats to the subspecies). In that review, [the Service] will evaluate whether the import contributes to the overall conservation of the species by considering whether the biological, social, and economic aspects of a program from which the specimen was obtained provide a net benefit to the subspecies and its ecosystem." 80 Fed. Reg. at 80,045.

32.     For both species, the Service uses the standards established by the International Union for the Conservation of Nature ("IUCN") to determine the impacts of trophy hunting programs, focusing on evaluating (1) biological sustainability, (2) net conservation benefit, (3) socio-economic-cultural benefit, (4) adaptive management, and (5) accountable and effective governance. *Id.*; 81 Fed. Reg. 36,388, 36,394 (June 6, 2016).

33.     In sum, an African elephant or lion hunting trophy can only be issued if the Service determines that the killing and import of that threatened species enhances the survival of

13

the species, meaning that the activity "must go beyond having a neutral effect and actually have a positive effect" on the species' conservation. U.S. Fish and Wildlife Service Handbook for Endangered and Threatened Species Permits (1996).

**B.     Convention on International Trade in Endangered Species of Wild Flora and Fauna**

34.     The Convention on International Trade in Endangered Species of Flora and Fauna is an international conservation treaty designed to ensure that international trade in animals and plants does not threaten their survival. Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249. The Convention recognizes that "wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems of the earth which must be protected for this and the generations to come." CITES, preamble, 27 U.S.T. at 1090.

35.     To receive protection under CITES, wildlife is first included on one of three CITES appendices, which provide the species varying degrees of protection. African lions are listed under Appendix II, which includes "species which although not necessarily now threatened with extinction may become so unless trade in specimens of such species is subject to strict regulation." CITES, art. II(2), 27 U.S.T. at 1092. African elephants in Zimbabwe, South Africa, Namibia, and Botswana are also listed on Appendix II, whereas all other African populations are listed on Appendix I, which includes "all species threatened with extinction which are or may be affected by trade." *Id.* art. II(1).

36.     African elephants listed on Appendix II are regulated subject to an annotation. That annotation, among other things, allows for trade in hunting trophies for non-commercial purposes. However, African elephants listed on Appendix I are "subject to particularly strict regulation in order not to endanger further their survival and must only be authorized in exceptional circumstances." *Id*.

14

37.     Trade in Appendix I and II species requires a finding that the trade is not detrimental to the survival of the species called a "non-detriment finding." In making such findings, the Service considers, among other factors: "[b]iological and management information" on the species; whether removal "is part of a biologically based sustainable-use management plan that is designed to eliminate over-utilization of the species;" information that the proposed activity will "not stimulate additional trade in the species;" and "the status of the species in the wild and the degree of risk the proposed activity poses to the species." 50 C.F.R. § 23.61(c), (e), (g).

38.     Due to the previous elephant poaching crisis, CITES established and maintains unique monitoring programs for elephants. One of these programs is the Elephant Trade Information System ("ETIS"), which documents CITES' parties' enforcement efforts and capabilities for enforcing the rule of law.

## C.     The Administrative Procedure Act

39.     The Administrative Procedure Act ("APA") provides for judicial review of final agency action for persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702.

40.     The APA authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). If an agency changes a policy or legal interpretation from a previously-held position, the new policy or interpretation is arbitrary or capricious unless the agency displays awareness that it has changed position and provides a reasoned explanation for why it believes the new interpretation is better than its previous interpretation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

41.     The adoption or rescission of legislative rules must comply with the notice-and-comment provisions of the Administrative Procedure Act (5 U.S.C. § 553). *See Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992).

## FACTUAL BACKGROUND

### A.     African Elephants and Their Population Status

42.     Elephants are highly intelligent, social animals who form strong, permanent social bonds with their family units.

43.     Elephants typically spend day-to-day in their immediate family unit or herd but migrate and seek resources encountering other elephant groups.

44.     In the wild, an elephant's home range is as much as 500 square miles, meaning that elephants routinely cross international boundaries, such as those between Zimbabwe and its neighboring countries such as Botswana, Zambia, and South Africa. These countries all share trans-boundary populations of elephants.

45.     Elephants walk long distances every day foraging and socializing with other elephants.

46.     Both male and female African elephants bear ivory tusks, which are used by the animals for myriad purposes.

47.     Ivory tusks have long been deemed desirable as personal trophies and for carvings and are deemed valuable by hunters and poachers.

48.     African elephants have suffered a catastrophic population decline of approximately 60 percent since 1978 when the species was first protected under the ESA as threatened. Today, there are hundreds of thousands fewer elephants in existence and elephant numbers continue to drop.

49.     The most comprehensive survey of African elephants – called the Great Elephant Census – indicates that an estimated 144,000 elephants were lost between 2007 and 2014 alone, and populations are currently shrinking by 8 percent per year continent-wide, primarily due to poaching. Tanzania, once a haven for the world's largest land animal, has been the epicenter of this freefall – the elephant population in Tanzania has decreased 50-60 percent just since 2009.

50.     In Zimbabwe, the elephant population is estimated to have decreased by six percent between 2001 and 2013 according to the Great Elephant Census and by approximately 18 percent between 2007 and 2013 according to the IUCN's African Elephant Specialist Group. This decline is significant, especially given the fact that African elephants reproduce very slowly and are being poached faster than they are being born. Such a precipitous loss of individuals threatens the continued existence of the species.

51.     A 2016 African Elephant Specialist Group report estimated Zimbabwe's elephant population at $82,630 \pm 8,589$, noting that poaching has "escalated in the past ten years" and become "a major problem in Zimbabwe."  The same report notes "[s]ignificant losses have been recorded in Tanzania."

52.     While Zimbabwe's elephant population faces an overall decline, regionally there are concerns. Serious population declines have been documented in two of the four main Zimbabwe elephant populations. In Sebungwe, the elephant population decreased by 74 percent, from about 11,000 to 4,000 elephants. And in Middle Zambezi, the population decreased by 40 percent, from about 18,000 to 11,500 elephants.



Figure 1. Zimbabwe's national elephant statistics, 2014. From The Zambezi Society Bulletin, February 2015 (http://us10.campaign-archive2.com/?u=f4943277ce971cb1c9028d068&id=50589e3c06).

53.     Poaching rates – whether for procurement of ivory or due to human-elephant conflict – are an on-going threat to elephants in Zimbabwe.

54.     The Great Elephant Census documented near eight percent carcass ratios in the country, meaning the survey recorded one dead elephant for every eight live elephants.

55.     Poaching by poison has been an on-going issue in Zimbabwe. More than 100 elephants were poisoned in 2013 and at least 14 elephants killed by poison near Hwange National Park in June of 2017.

**B.     African Lions and Their Population Status**

56.     Lions are highly intelligent, social animals who form strong, permanent social bonds with their family units.

57.     Lions live in groups called "prides," which are "fission-fusion" social units defined as a stable membership that can be divided into small groups throughout the range. Each pride has a territory of 20-500 km$^2$ depending on availability of prey, meaning that lions

18

routinely cross international boundaries, such as those between Zimbabwe and its neighboring countries including Botswana, Zambia, and South Africa. These countries all share trans-boundary populations of lions.

58.     Male lions disperse from their natal groups and form coalitions to take over a pride in order to reproduce. Upon takeover or demise of a previous male, it is to the new males' reproductive advantage to kill all the suckling cubs in the pride as this will cause the nursing lionesses to renter estrous within a few weeks, enabling the new males to sire offspring.

59.     For these reasons, scientific literature suggests that if any hunting is to be allowed, only male lions should be hunted and age restrictions should be imposed to ensure that hunters target males that are six years or older, as they may be less likely to be actively procreating and their loss may be less likely to spur infanticide events in lion prides.

60.     Male lions with large manes are targeted by trophy hunters, and lion bones are deemed commercially value for medicinal purposes in international trade.

61.     African lions are thought to number between 30,000 to 20,000 having suffered approximately a 43 percent population decline continent-wide in the last 21 years. African lions in western and northern Africa are listed as endangered (50 C.F.R. § 17.11), and populations in eastern and southern Africa are threatened with extinction.



From CMS Lion Listing Proposal by Chad, Niger, Togo, Figure 1

62.     In Zimbabwe, in 2014 the IUCN estimated the lion population at roughly 703

lions. In Tanzania, well-studied lion populations have declined by as much as 59 percent since

1993. There are only approximately 2,300 wild lions remaining in South Africa, confined almost

entirely to two national parks.

63.     In addition to threats from loss of habitat and prey and human-lion conflict,

empirical data demonstrates that excessive offtake from trophy hunting has lowered population

density of lions and altered sex-ratios of lions in Zimbabwe and other countries.

64.     Unfenced lion populations in Zimbabwe have declined over the past decade and

today fewer than 300 truly wild adult male lions remain in the country.

### C.      Trophy Hunting Impacts on Elephants and Lions

65.     Trophy hunters routinely target the biggest and strongest male lions and elephants, but removing these animals from the breeding pool unnaturally selects for smaller and weaker animals and reduces a population's reproductive capacity.

66.     By removing males in their prime from the population, trophy hunting can decrease genetic variation, shift the population structure, decrease population density, and cause unnatural evolutionary impacts (such as increasing the occurrence of mature elephants with no tusks).

67.     Additionally, due to instability created by removing dominant males, trophy hunting can have cascading lethal impacts on lion and elephant social groups.

68.     Trophy hunting of female African elephants, who also bear ivory, can destabilize social structures and cause loss of social knowledge.

69.     Further, when trophy hunting is sanctioned, poaching activity increases, likely due to the perception that species authorized for hunting are of diminished value and the perception that legal killing increases the acceptability of poaching.

70.     As little as 3-5 percent of trophy hunting revenues are shared with local communities or otherwise contribute towards disincentivizing poaching or protecting habitat.

71.     Further, while overall tourism in Zimbabwe and other African countries popular with trophy hunters is valued at between 2.8 and 5.1 percent of Gross Domestic Product ("GDP"), the total annual economic contribution of trophy hunters is at most an estimated 0.03 percent of GDP.

### D.      Zimbabwe Corruption and Wildlife Management Failures

72.     Corruption is a major concern in Zimbabwe.

73.     This is an issue in particular because wildlife trade and trafficking are the fourth largest black market in the world, behind only narcotics, weapons, and humans. Thus, where corruption abounds so can illegal wildlife trade.

74.     Zimbabwe scored a 22 on Transparency International's 2016 Corruption Perception Index.

75.     The Index measures perceived levels of public sector corruption based on expert opinion and is based on a scale of 0 (highly corrupt) to 100 (very clean).

76.     The likelihood of a country being able to strictly manage a hunting program is significantly diminished when corruption is a problem.

77.     Additionally, the World Justice Project (WJP) Rule of Law Index 2016 ranked Zimbabwe 108 of 113 countries and jurisdictions, meaning that Zimbabwe has the sixth worst rule of law.

78.     In 2015, three Zimbabwe Parks and Wildlife Management Authority ("ZPWMA") staff members were arrested for involvement in the theft of ivory from a government stockpile held at Hwange National Park.

79.     At the time the elephant enhancement decision was announced, Zimbabwe's president was on house arrest amidst a military coup d'état.

80.     Zimbabwe's Communal Areas Management Programme for Indigenous Resources ("CAMPFIRE") program was designed to empower community members at a village level to control wildlife and associated revenue. However, CAMPFIRE has failed as a governance system for community involvement and empowerment, and revenue generated through elephant hunting does not actually benefit local communities or provide an incentive to conserve wildlife. For example, elephant populations of both Sebungwe and Gonarhezou where

CAMPFIRE applies have experienced particularly dramatic elephant population declines in recent years.

**E.      Zimbabwe's Failure to Sustainably Manage Elephants**

81.     Despite its elephant population continuing to decline every year since 2001, since 2004 Zimbabwe has refused to alter its African elephant export quota established under CITES.

82.     This export quota stands at 1,000 tusks from 500 animals exported as trophies.

83.     In 2015, Zimbabwe updated its 1996 and 1997 elephant management documents creating a new management plan that includes, among other things, an outline for managing elephant hunting.

84.     The plan includes five key components: protection and law enforcement; biological monitoring and management; social, economic and cultural framework; building conservation capacity; and coordination, collaboration and program management.

85.     The plan also includes development of a management plan for the four key elephant populations: Northwest Matabeleland (a.k.a. Hwange area); Sebungwe; mid-Zambezi Valley; and South East Lowveld (a.k.a. Gonarezhou area).

86.     The plan denotes the need for $12 million per year for operational costs alone.

87.     Despite its recognition of significant elephant poaching in Sebungwe and Middle Zambezi, the plan still authorizes elephant hunting in these areas.

88.     The plan details the need for reporting of the age, sex, and size of elephants hunted.

89.     The U.S. is by far the leading importer of African elephant parts as hunting trophies.

23

90.     According to trade data compiled by the Service, from 2003-2014, trophies of over 10,000 African elephants were imported into the U.S. More than 40 percent of those trophies were sourced from Zimbabwe.

91.     Zimbabwe's negative corruption ranking has had adverse implications for its enforcement metrics. The CITES 2016 ETIS report noted that Zimbabwe pulled the rule of law score down. The same report also raised concerns with Zimbabwe's ivory carving industry.

### F.     Zimbabwe's Failure to Sustainably Manage Lions

92.     Between 2005 and 2014, American trophy hunters imported 411 lion trophies from Zimbabwe.

93.     Zimbabwe has a 2006 lion management plan that was drafted in coordination with trophy hunters. Zimbabwe has not updated its lion management plan since 2006.

94.     The plan has three main objectives: the persistence of key and other lion populations; reduction of human and livestock loss; and optimization of wildlife conservation-related net benefits to local communities.

95.     To achieve these objectives, the 2006 plan delineated seven outputs, none of which have been completed as of 2017.

96.     The plan also delineated 108 necessary conservation activities, but available documentation indicates that only 26 of those activities have been completed.

97.     The plan authorizes the hunting of lions, including male lions that are currently affiliated with prides and siring cubs, despite ample scientific evidence that hunting male lions causes social instability that has cascading lethal impacts on lion populations.

98.     The 2006 plan does not prohibit the hunting of female lionesses, despite the fact

that removing females has a severe negative impact on the reproductive capacity of lion

populations.

99.     Lion hunting quotas for each year are determined by a point system based off of

the hunts from the previous season, creating a financial incentive to misrepresent information

about lions killed during a season.

100.    Lions that attack livestock are lethally eliminated.

101.    Zimbabwe does not provide funding for lion conservation through its central

treasury, creating an unsustainable dependency on trophy hunting for revenue.

**G.      FWS's 2014 and 2015 Findings Prohibiting Imports of Elephants from Zimbabwe and Tanzania**

102.    Beginning in 2014 (and extended indefinitely in 2015), the Service determined

that hunting African elephants in Zimbabwe and Tanzania does not enhance the survival of the

species. *See* 79 Fed. Reg. 44,459 (July 31, 2014); 80 Fed. Reg. 42,524 (July 17, 2015).

103.    Those findings concluded that there are numerous problems with Zimbabwe and

Tanzania's elephant management scheme: the lack of an elephant management plan; lack of

sufficient data on population numbers and trends on which to base management decisions; weak

implementation and enforcement; lack of evidence that legal offtake is biologically sustainable,

taking into account illegal offtake; lack of information about how money from trophy hunting by

U.S. hunters is distributed within Zimbabwe and concerns about its distribution in Tanzania; and

lack of a national mechanism, such as government support, to sustain elephant conservation

efforts in the country.

104.    The findings specifically concluded that both elephant population declines and

increased poaching are occurring in CAMPFIRE areas.

105.    The findings raised questions about the 1996 and 1997 elephant management plans in place, but noted the 1996 plan provided that the "sport hunting quota should be reduced, to zero if necessary, if more than 0.75% of the population is being killed in other ways."

106.    The 2014 Zimbabwe finding noted "it is vital" to have population estimates or trends upon which to base management decisions. The findings found that updated population estimates were lacking for Zimbabwe and anticipated updated data from the Great Elephant Census on both population estimates and carcass ratios.

107.    The 2015 Zimbabwe finding reported the preliminary results of the Great Elephant Census of Zimbabwe, estimating the population between 82,000 and 83,000 elephants – a six percent decline since the 2001 surveys.

108.    The 2015 Zimbabwe finding further reported preliminary carcass counts from the Census as follows:  approximately 553 carcasses in Mid Zambezi Valley (4.3% of live population); approximately 1,424 carcasses in Sebungwe (28.2%); approximately 4,087 carcasses in North West Matabeleland (7.6%); and approximately 523 carcasses in Gonarezhou National Park (4.6%).

109.    The 2014 and 2015 Zimbabwe findings question a 2013 carcass ratio of four percent for Gonarezhou National Park as "unrealistically low" given that natural mortality is generally in-and-of-itself four percent and poaching was a significant contributor to mortality.

110.    The 2014 and 2015 Zimbabwe findings further noted that the failure to properly protect elephants in Zimbabwe led to a significant decline in the elephant population, including large-scale poisoning of elephants at watering holes, and expressed concern about the long-term survival of elephants in Zimbabwe.

111.    Based on similar management failures and an ongoing poaching crisis in Tanzania, the Service issued a negative enhancement finding for elephant imports in 2014 and 2015, and continued to prohibit the import of elephant trophies from Tanzania through 2017.

112.    These findings prohibited the issuance of import permits for trophies of elephants killed in Zimbabwe and Tanzania during those calendar years.

113.    Hunting organizations challenged the 2014 and 2015 findings in court.

114.    The District Court upheld the 2014 and 2015 findings for Zimbawe. *Safari Club Int'l v. Jewell*, 213 F. Supp. 3d 48 (D.D.C. 2016).

115.    The hunting organizations appealed that order. The U.S. Court of Appeals upheld FWS' decision to apply the enhancement standard to the import of threatened species trophies but found that the 2014 and 2015 findings for Zimbabwe were rules that should have been subjected to public notice and comment. *Safari Club Int'l v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017).

116.    The challenge to the 2014 Tanzania finding is pending before this court on summary judgment, in related Case No. 1:14-cv-00670-RCL.

**H.    FWS's 2016-2018 Zimbabwe Elephant Finding**

117.    Following the Service's suspension of elephant imports from Zimbabwe, U.S. trophy hunting advocates worked with Zimbabwe in seeking reversal of the decision.

118.    While the facts have not changed on the ground, the Service provided notice of a new finding dated November 16, 2017 ("Elephant Finding") that concluded that hunting elephants in Zimbabwe enhances the survival of the species. 82 Fed. Reg. 54,405 (Nov. 17, 2017).

119.    The Elephant Finding is based on information submitted by the Government of Zimbabwe, hunting organizations, and others since 2014. The Elephant Finding claims to be based on comments received from interested parties, yet neither Plaintiffs nor members of the public at large were given an opportunity to comment on the Elephant Finding before it was finalized.

120.    The Elephant Finding is based on various pieces of information submitted by the Government of Zimbabwe throughout 2016 and 2017 but is backdated to January 21, 2016 allowing import of elephant trophies from this date through December 31, 2018.

121.    The new Elephant Management Plan upon which the Elephant Finding relies acknowledges that it "'is an ambitious plan' and that the implementation would 'require more human and financial resources than are currently available for the conservation and management of elephants in Zimbabwe.'"

122.    FWS also finds that "that Zimbabwe does not currently have sufficient resources to fully implement the" Elephant Management Plan.

123.    The Elephant Finding also notes that ZPWMA provides law enforcement functions associated with controlling and maintaining wildlife resources, but that the ZPWMA receives no significant government funding.

124.    After FWS expressed concern over whether adequate resources were available to implement the Elephant Management Plan, the ZPWMA provided a "supplemental" elephant management plan by letter dated November 8, 2016.

125.    This supplement allegedly provides a short list of priorities for elephant management.

126.     The Elephant Finding determines that ZPWMA is "making an effort to make progress toward" implementation of the Elephant Management Plan.

127.     FWS suggests that Zimbabwe has revised elephant population data for 2015, but the Elephant Finding neither discloses this population information nor how the surveys were conducted relying instead upon elephant population data from the Great Elephant Census in 2014 and the African Elephant Specialist Group in 2016.

128.     The 2017 report for the CITES Standing Committee found that Zimbabwe's elephant population is continuing to decline.

129.     The Elephant Finding notes "evidence of corruption or collusion within the wildlife sector" and provides as an example the loss of rhino horns from a government stockpile.

130.     As in its earlier findings, the Elephant Finding questions why Zimbabwe maintains the same CITES export quota, of 500 elephants or 1,000 tusks year to year, but nevertheless accepts this situation noting this issue will be revisited in the 2018 finding.

131.     The Elephant Finding relies upon an estimate of 215 elephants being killed for trophies per year between 2010 and the first six months of 2015 in approximating annual mortality of elephants in Zimbabwe.

132.     This estimate is from 2015 when U.S. hunters, roughly 54 percent of those who hunt in the country, could not import elephant trophies.

133.     The Elephant Finding indicates Zimbabwe set an internal quota for 2016 of 400 elephants.

134.     The Elephant Finding does not indicate what the 2017 elephant quota will be but Zimbabwe has reported a quota to CITES of 500 elephants.

135.    The Elephant Finding does not indicate what the 2018 elephant quota will be in Zimbabwe.

136.    The Elephant Finding states that Zimbabwe's Parks and Wildlife Act devolved authority to manage wildlife on private and communal land to the landholder, pursuant to the CAMPFIRE program established in 1989.

137.    The Elephant Finding estimates annual loss/mortality of elephants from different causes in Zimbabwe – putting the number at about two percent from all sources but says nothing about annual recruitment.

138.    The Elephant Finding estimates annual loss of elephants due to poaching noting in 2009 and 2010 on average 111 elephants were poached, between 2011 and 2013 the average "more than doubled to 243 elephants" although the 2013 estimate was then raised to 293 and declined to 194 in 2014.

139.    The Elephant Finding notes that, according to ZPWMA, 11 live elephants were exported in 2012 and 2014, but that the CITES trade database documents the export of 18 live elephants in 2012 and 27 in 2015.

140.    The Elephant Finding accepts Zimbabwe's assertion that three of the four primary elephant areas "exceed desired density" despite the fact that in one of these areas (Middle Zambezi) the elephant population decreased by 40 percent.

141.    The Elephant Finding determines that 54 percent of the hunting market in Zimbabwe is made up of U.S. hunters and elephant hunting is a big attraction for these hunters.

142.    The Elephant Finding lists seven items – ranging from elephant management plan implementation to provision of population information – for further consideration.

143.     Despite the lack of evidence demonstrating Zimbabwe is implementing its new elephant plan, continued elephant population decline, significant remaining corruption concerns, and other evidence and information before the Service, the Service erroneously concluded that elephant hunting in Zimbabwe enhances the survival of the species.

### I.     FWS's 2016-2018 Zimbabwe Lion Finding

144.     For the first time following FWS' decision in December 2015 to list African lions as a threatened species, on October 11, 2017, the Service announced that it made a positive enhancement finding and would allow the import of African lion trophies hunted in Zimbabwe in calendar years 2016, 2017, and 2018 ("Lion Finding").

145.     The Lion Finding is based primarily on information submitted by the Government of Zimbabwe in October 2016 – without application of independent scientific scrutiny – yet the Lion Finding is backdated to January 22, 2016.

146.     The Lion Finding claims to be based on comments received from interested parties, yet neither Plaintiffs nor members of the public at large were given an opportunity to comment on the Lion Finding before it was finalized.

147.     The Service concedes that to sustainably manage wildlife and determine the impacts of trophy hunting, it is vital to possess sufficient data on population numbers and trends.

148.     The lion population estimate included in the Lion Finding is more than 16 percent inflated from the numbers included in the source document from Zimbabwe that the Service relied on in making the Lion Finding, which demonstrates that fewer than 300 truly wild adult male lions remain in the country.

149.     The Service acknowledges that is has no evidence that lion population surveys have been conducted in Zimbabwe since 2015.

150.    The Lion Finding acknowledges that lion population density is directly related to prey density, and that prey species have declined in recent years due to drought in Zimbabwe.

151.    The Lion Finding notes that there is a significant threat to lions from habitat loss in Sebungwe and the South East Low Veld in Zimbabwe, where increasing human and livestock populations encroach on lion habitat.

152.    The Lion Finding acknowledges that international trade in lion parts and products is emerging as an additional threat to the species, that there are no records of enforcement actions taken for possession of illegally acquired lion specimens in Zimbabwe, and that the extent of the lion part trade in Zimbabwe is unclear.

153.    The Lion Finding states that while ZPWMA provides law enforcement functions associated with controlling and maintaining wildlife resources, but that it receives no significant government funding.

154.    The Service concedes that the Lion Finding is based on an outdated 2006 management plan that must be updated based on ample scientific developments since its adoption.

155.    The Lion Finding acknowledges that while Zimbabwe claims to have a management plan specifically for Hwange National Park, no such plan has been produced to the Service.

156.    The Lion Finding only analyzes three of seven outputs of Zimbabwe's plan, ignoring evidence demonstrating a lack of progress toward meeting the stated targets and undertaking the stated activities in the plan.

157.    The Lion Finding states that Zimbabwe applies age-based restrictions on lion hunting, but the Service acknowledges that those age restrictions are not fully implemented or

enforced, and that those restrictions do not apply in CAMPFIRE areas where lion trophy hunting occurs.

158.     The Lion Finding concedes that Zimbabwe is not applying the best available science on age restrictions, allowing lions five years of age to be hunted and exported.

159.     The Lion Finding concedes that age-based restrictions are not sufficiently enforced, as more than 20 percent of lions hunted in Zimbabwe in 2015 were under the age of five.

160.     Zimbabwe sets lion quotas through a workshop involving trophy hunters (who have a self-interest in such quotas), not by applying the best available science. Even when the workshop does not yield enough information to set a quota, a "precautionary quota" is nevertheless issued to allow lion hunting.

161.     The Lion Finding's conclusion that Zimbabwe's lion hunting quota is sustainable is based on inflated population estimates.

162.     Outside of the quota, hunting concessionaires are allowed to buy additional animals, and the Service acknowledges that it is unclear how many animals are allowed to be so purchased or how Zimbabwe ensures that such a process does not exceed the national quota.

163.     The Lion Finding states that U.S. hunters account for 51 percent of the revenue derived from hunting across the country and 72 percent of the lion hunting (including 90 percent of the revenue from lion hunting in Babuye and Save).

164.     Despite the substantial flaws in Zimbabwe's lion management program and other evidence and information before the Service, the Service erroneously concluded that lion hunting in Zimbabwe enhances the survival of the species. The agency concludes that "the harvest and import of sport-hunted trophies of lions within Zimbabwe meet the purposes of the ESA."

165.    The Lion Finding, which is backdated to January 22, 2016, directly contradicts findings that the Service made in the final lion listing rule, which was published on December 23, 2015 and became effective on January 22, 2016. The Service failed to explain why it departed from its previous statements that Zimbabwe's lion management program is inadequate to promote conservation. *See* 80 Fed. Reg. 80,000, 80,016-38 (Dec. 23, 2015) (concluding that Zimbabwe's lion quotas are not based on scientific evidence or accurate survey data; stating that age restrictions must be strictly enforced in order to be an adequate management technique; and Zimbabwe's hunting regulations incentivize killing lions under the minimum age limit).

166.    The Service failed to explain why it departed from its position that Zimbabwe's lion management program fails to protect lions.

**J.      FWS' Decision Purporting to Rescind Prior Enhancement Findings**

167.    On March 1, 2018, Principal Deputy Director of the Service Greg Sheehan signed a memorandum that purports, in the first instance, to withdraw all of the country-wide enhancement findings the Service has made to authorize the import of trophies of species of African elephants and threatened African lions listed under the ESA ("Rescission Memo").

168.    Specifically, the Rescission Memo states that it withdraws the 1997, 2014, 2015, and 2017 enhancement findings for African elephants taken in Zimbabwe; the 2017 enhancement finding for African lions taken in Zimbabwe; the 1997, 2014, and 2015 enhancement findings for African elephants taken in Tanzania; the 1995 enhancement finding for African elephants taken in South Africa; the 2016 and 2017 enhancement finding for African lions taking in South Africa; the 1997 enhancement finding for bontebok taken in South Africa; the 1997 enhancement finding for African elephants taken in Botswana; the 1995 enhancement finding for African elephants taken in Namibia; the 2012 and 2017 enhancement findings for African elephants

34

taken in Zambia; and the 2017 enhancement finding for African lions taken in Zambia.

Additionally, the Rescission Memo withdraws the 2014, 2015, and 2017 non-detriment findings

for African elephant trophies taken in Tanzania.

169.    The Rescission Memo further provides that "Service intends to use the

information cited in these findings and contained in its files as appropriate, in addition to the

information it receives and has available when it receives each application, to evaluate individual

permit applications."

170.    The Rescission Memo was not published in the Federal Register, nor did the

Service solicit public comments on the Rescission Memo.

## CLAIMS FOR RELIEF

## FIRST CLAIM

**FWS Acted Arbitrarily and Capriciously in Issuing the 2016-2018 Enhancement Finding
for Zimbabwe Elephants in Violation of the APA**

171.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

172.    To make a positive enhancement finding for African elephants under the ESA, the

Service must evaluate: the range country's management plans to determine if the overall

conservation and management of the species is based on sound scientific principles as well as

reviewing the animal population at issue and its status, the regulatory system and enforcement

thereof, and specifically how hunting is managed in the country.

173.    The Service may issue an enhancement finding if, among other things, the best

available science supports a conclusion that the management plan actively addresses the current

and long term threats to the species and thus affirmatively benefits the survival of the species.

Here the Service finds that Zimbabwe lacks the resources to implement its new Elephant

Management Plan but nevertheless relies upon implementation of that plan ignoring copious scientific evidence demonstrating that the management of elephants in Zimbabwe fails to adequately protect the species.

174.     The Service may issue an enhancement finding if, among other things, it can evaluate the population and trends of the species over time to discern the impacts of trophy hunting and ensure that monitoring of the population and cross-border conservation are occurring. Here, this information was lacking yet FWS nevertheless makes a positive finding despite failing, among other things, to: indicate births/recruitment into the elephant population; provide updated population estimates; accurately estimate annual mortality; or provide a rational discussion of the impacts of trophy hunting that considers all relevant factors.

175.     The Service's conclusions in the enhancement finding are belied by the record and are arbitrary and capricious and not in accordance with law, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

176.     Additionally, in issuing its 2017 Elephant Finding, FWS departs from its 2014 and 2015 elephant findings without explanation, including by failing to adequately explain why obtaining funding from only trophy hunting was a concern in 2014-2015 but is not a concern now; how Zimbabwe has addressed corruption in its wildlife sector when poaching is still on-going and the country's corruption index is incredibly weak; and how a new elephant management plan coupled with insufficient resources to implement it, especially in light of the coup d'état, created change on the ground from the 1996 and 1997 plans.

177.     In its March 1, 2018 Rescission Memo, the Service claims to have rescinded the 2016-2018 enhancement findings for elephants and lions from Zimbabwe, yet states that it will continue to base future permitting decisions on those findings.

36

178.     The Service has failed to explain its multiple policy reversals and such action is arbitrary and capricious and not in accordance with law, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## SECOND CLAIM

### In Issuing the 2017 Elephant Findings FWS Acted Contrary to Law

179.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

180.     The Service's decisions to allow the import of hunting trophies from African elephants hunted in Zimbabwe in calendar years 2016, 2017, and 2018 undermines the conservation of this threatened species and thus is contrary to the conservation mandate of the Endangered Species Act and the Act's requirement that prohibited activities "enhance" the survival of the species and the findings are not in accordance with law under the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

181.     Defendant's violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## THIRD CLAIM

### FWS Failed to Follow Proper Rulemaking Procedures in Issuing the 2017 Zimbabwe Elephant Finding

182.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

183.    Neither Plaintiffs nor members of the public at large were given notice of or the opportunity to review or comment on proposed findings authorizing the import of elephants from Zimbabwe in 2016-2018.

184.    By failing to undertake a notice and comment rulemaking process prior to adopting the 2017 Elephant Finding, FWS violated the Administrative Procedure Act. 5 U.S.C. § 553; *Safari Club Int'l v. Zinke*, 878 F.3d 316, 334 (D.C. Cir. 2017).

185.    Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## FOURTH CLAIM

### FWS Acted Arbitrarily and Capriciously in Issuing the 2016-2018 Enhancement Finding for Zimbabwe Lions in Violation of the APA

186.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

187.    To make a positive enhancement finding for African lions under the ESA, the Service must evaluate the range country's management plans to determine if the overall conservation and management of the species is based on sound scientific principles as well as reviewing the animal population at issue and its status, the regulatory system and enforcement thereof, and specifically how hunting is managed in the country.

188.    The Service may issue an enhancement finding if, among other things, the best available science supports a conclusion that the management plan actively addresses the current and long term threats to the species and thus affirmatively benefits the survival of the species. Here the Service ignored copious scientific evidence demonstrating that the management of lions

in Zimbabwe fails to adequately protect the species and that trophy hunting is unsustainable and poses a threat to the survival of the population.

189.     The Service may issue an enhancement finding if, among other things, it can evaluate the population and trends of the species over time to discern the impacts of trophy hunting and ensure that monitoring of the population and cross-border conservation are occurring. Here, this information was lacking yet FWS nevertheless makes a positive finding despite failing, among other things, to: indicate births/recruitment into the lion population; provide updated population estimates; accurately estimate annual mortality; or provide a rational discussion of the impacts of trophy hunting that considers all relevant factors.

190.     The Service's conclusions in the enhancement finding are belied by the record – including the Service's findings included in the final lion listing rule (80 Fed. Reg. 80,000 (Dec. 23, 2015) – and are arbitrary and capricious and not in accordance with law, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

191.     Additionally in issuing its 2017 Lion Finding, FWS departs from its 2014 and 2015 elephant findings regarding Zimbabwe's management of and funding for wildlife populations without explanation, including by failing to adequately explain why obtaining funding from only trophy hunting was a concern in 2014-2015 but is not a concern now; or how Zimbabwe has addressed corruption in its wildlife sector.

192.     In its March 1, 2018 Rescission Memo, the Service claims to have rescinded the 2016-2018 enhancement findings for elephants and lions from Zimbabwe, yet states that it will continue to base future permitting decisions on those findings

193.     The Service has failed to explain its policy reversals and such actions are arbitrary and capricious and not in accordance with law, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

194.     Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## FIFTH CLAIM

### In Issuing the 2017 Lion Findings FWS Acted Contrary to Law

195.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

196.     The Service's decisions to allow the import of hunting trophies from African lions hunted in Zimbabwe in calendar years 2016, 2017, and 2018 undermines the conservation of this threatened species and thus is contrary to the conservation mandate of the Endangered Species Act and the Act's requirement that prohibited activities "enhance" the survival of the species and the findings are not in accordance with law under the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

197.     Defendant's violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## SIXTH CLAIM

### FWS Failed to Follow Proper Rulemaking Procedures in Issuing the 2017 Lion Findings

198.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

199.    Neither Plaintiffs nor members of the public at large were given notice of or the opportunity to review or comment on proposed findings authorizing the import of lions from Zimbabwe in 2016-2018 or notice and a copy of the final decision.

200.    By failing to undertake a notice and comment rulemaking process prior to adopting the 2017 Lion Finding, FWS violated the Administrative Procedure Act. 5 U.S.C. § 553; *Safari Club Int'l v. Zinke*, 878 F.3d 316, 334 (D.C. Cir. 2017).

201.    Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## SEVENTH CLAIM

### FWS Failed to Comply with the APA When it Took Action To Try To Rescind Prior Legislative Rules without Public Notice and Comment

202.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

203.    An agency action is a legislative rule with the force of law if effectively amends or repudiates a prior legislative rule.

204.    Even if the prior legislative rule was improperly adopted, a subsequent legislative rule rescinding that prior rule must follow proper notice and comment rulemaking procedures.

205.    Enhancement findings for trophy imports are legislative rules. Therefore, the Service's Rescission Memo purporting to withdraw prior country-wide enhancement findings without public notice and comment is not in accordance with the Administrative Procedure Act. 5 U.S.C. §§ 553, 706(2)(A).

206.    The Rescission Memo further withdraws non-detriment findings indicating that such findings also require the same process, which was not provided when the decisions were

made or withdrawn in violations of the Administrative Procedure Act. 5 U.S.C. §§ 553, 706(2)(A).

207.    Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## EIGHTH CLAIM

### FWS Failed to Comply with the APA When It Established a New Policy for Implementing the ESA and CITES Permitting Programs without Public Notice and Comment

208.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

209.    The Service's decision to discontinue issuing comprehensive country-wide enhancement and non-detriment findings for the import of hunting trophies of African elephants and threatened African lions, and instead issue enhancement and non-detriment findings (where applicable) on a case-by-case basis, is a substantive policy that changes how the Service evaluates permit applications for trophy imports and alters the rights and interests of trophy importers and stakeholders.

210.    Therefore, the Service's Rescission Memo, which established a new substantive policy for Endangered Species Act and CITES permitting without soliciting public notice and comment, is not in accordance with the Administrative Procedure Act. 5 U.S.C. §§ 553, 706(2)(A).

211.    Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

A.  Declare that Defendants' November 16, 2017 enhancement determination regarding Zimbabwe elephants violates the APA and is counter to the ESA;

B.  Declare that Defendants' October 11, 2017 enhancement determination regarding Zimbabwe lions violates the APA and is counter to the ESA;

C.  Declare that Defendants unlawfully changed their position from the 2014 and 2015 non-enhancement determinations without the required rational explanation for the agency's change in position;

D.  Declare that Defendants unlawfully failed to undertake the required notice and comment rulemaking process before adopting the November 16, 2017 enhancement determination regarding Zimbabwe elephants and the October 11, 2017 enhancement determination regarding Zimbabwe lions;

E.  Declare that Defendants unlawfully failed to undertake the required notice and comment rulemaking process in purporting to rescind past country-wide enhancement and non-detriment findings in its March 1, 2018 memorandum;

F.  Declare that Defendants unlawfully failed to undertake the required notice and comment rulemaking process in adopting a rule to make trophy import enhancement and non-detriment findings on a case-by-case basis;

G.  Declare that it would be unlawful for Defendants to issue any import permits for African elephant or African lion trophies from Zimbabwe pursuant to these unlawful findings;

H.  Set aside and remand the challenged Zimbabwe enhancement findings;

I.  Award Plaintiffs their fees and costs; and

J.   Grant Plaintiffs such other relief as the Court deems just and proper.


DATED:  March 20, 2018                    Respectfully submitted,

                                          /s/ Tanya M. Sanerib_____
                                          Tanya M. Sanerib (D.C. Bar No. 473506)
                                          Telephone: (206) 379-7363
                                          tsanerib@biologicaldiversity.org

                                          Sarah Uhlemann (D.C. Bar No. 501328)
                                          Telephone: (206) 327-2344
                                          suhlemann@biologicaldiversity.org
                                          Center for Biological Diversity
                                          2400 NW 80th Street, #146
                                          Seattle, WA 98117

                                          Anna Frostic (D.C. Bar No. 977732)
                                          Telephone: (202) 676-2333
                                          afrostic@humanesociety.org
                                          The Humane Society of the United States
                                          1255 23rd Street NW, Suite 450
                                          Washington, D.C. 20037

                                          Counsel for Plaintiffs