# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Case No. 17-cv-2504-RCL |
| RYAN ZINKE, in his official capacity as Secretary of the United States Department of Interior, *et al.*, ) ) ) ) | |
| Defendants, ) ) | |
| and ) ) | |
| SAFARI CLUB INTERNATIONAL, *et al.*, ) ) | |
| Defendant-Intervenors ) ) | |

## MEMORANDUM OPINION

In Fall 2017, the U.S. Fish and Wildlife Service (the "Service") issued two new findings with respect to elephants and lions in Zimbabwe. By determining that permitted hunting of these animals will enhance the survival of each species, the country-wide findings paved the way for U.S. importation of sport-hunted trophies of these animals. After the D.C. Circuit held in December 2017 that two earlier country-wide enhancement findings by the Service were legislative rules requiring public notice and comment pursuant to the Administrative Procedure Act ("APA"), *see Safari Club Int'l v. Zinke*, 878 F.3d 316, 331–35 (D.C. Cir. 2017) ("*Safari Club II*"), the Service withdrew the 2017 Zimbabwe elephant and lion findings, along with other prior country-wide enhancement and non-detriment findings. Moving forward, the Service announced that it would instead make these findings on a case-by-case basis upon application to import a

sport-hunted trophy.

Organizational plaintiffs Center for Biological Diversity (the "Center"), Humane Society International ("HIS"), Humane Society of the United States ("HSUS"), and Born Free USA, along with individual plaintiff Ian Michler (collectively, "plaintiffs") bring an eight-count complaint challenging the actions of the government. Second Am. Compl., ECF No. 41. Upon motion, Safari Club International and the National Rifle Association of America were permitted to intervene as defendants (the "intervenor-defendants"). Order, ECF No. 24. In claims one through six, plaintiffs challenge the now-withdrawn 2017 Zimbabwe elephant and lion findings. Second Am. Compl. ¶¶ 171–201. In claim seven, plaintiffs allege the Service violated the APA by withdrawing the various enhancement and non-detriment findings without soliciting public notice and comment. *Id.* ¶¶ 202–07. And in claim eight, plaintiffs claim the Service violated the APA by changing from country-wide findings to case-by-case determinations without soliciting public notice and comment. *Id.* ¶¶ 208–11

Now, both the government and the intervenor-defendants move to dismiss the complaint in its entirety. *See* Federal Defs.' Mot. Dismiss, ECF No. 44; Intervenor-Defendants' Mot. Dismiss, ECF No. 42. For the reasons set forth herein, those motions will be **GRANTED**.

I.    **BACKGROUND**

   A. **The Convention on International Trade in Endangered Species of Wild Fauna and Flora and the Endangered Species Act**

Importation into the United States of threatened species such as African elephants and lions is governed by international convention and U.S. law.

The Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), Mar. 3, 1973, 27 U.S.T. 1087, is a multilateral treaty to which both the United States and Zimbabwe are parties. *See* 16 U.S.C. § 1538(c)(1) (incorporating CITES into U.S. domestic

law through the Endangered Species Act). CITES regulates the international trade of protected plants and wildlife by establishing requirements for importing and exporting covered species categorized into three appendices based on the level of protection each requires. *See id.* §§ 1537a–1539. Signatories to CITES, including the United States and Zimbabwe, agree that they "shall not allow trade in specimens of species included in Appendices I, II and III except in accordance with the provisions of" the treaty. CITES, art. II.4.

Elephants in Zimbabwe were listed on Appendix I until 1997 and now are listed on Appendix II. Changes in List of Species in Appendices to the [CITES], 62 Fed. Reg. 44,627, 44,628–29 (Aug. 22, 1997). African lions in Zimbabwe are also listed on Appendix II. While Appendix I lists species "threatened with extinction which are or may be affected by trade," CITES, art. II(1), Appendix II includes species that are not necessarily currently threatened but that may become threatened with extinction unless trade of specimens of such species is regulated. *Id.* art. II(2). Under CITES, a species listed on Appendix II may be traded if the exporting countries issue export permits. *Id.* art. IV. In issuing permits, the exporting country must make certain findings, including that the specimen was legally acquired, and that trade of the specimen will not be detrimental to the survival of the species (a non-detriment finding). *Id.* art. IV.2(a)–(b).

"It is undisputed that the proscriptions in [CITES] are a floor, not a ceiling, for protection of Appendix II species." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 321 (D.C. Cir. 2017). In fact, the treaty makes clear that it "in no way affect[s] the right of Parties to adopt . . . stricter domestic measures regarding the conditions for trade, taking possession or transport of specimens of species included in Appendices I, II, and II, or the complete prohibition thereof." CITES, art. XIV(1).

To that end, Congress passed the Endangered Species Act ("ESA") to provide for the conservation of "endangered" and "threatened" species. 16 U.S.C. § 1531(b). Described as "the

most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978), the ESA not only implements CITES into U.S law but also provides federal protection to species listed as endangered or threatened pursuant to its provisions. *See* 16 U.S.C. §§ 1533(d), 1538(a). Furthermore, the listing of a species as endangered or threatened does not depend on whether or how it is categorized under CITES. *See id.* § 1533(a)(1)(A).

While the ESA generally forbids the importation of endangered species into the United States, *id.* § 1538(a)(1)(A); 50 C.F.R. § 17.21(b), the Act empowers the Service to issue regulations pertaining to threatened species "deem[ed] necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). Pursuant to this authority, the Service has issued a regulation that extends the ESA's prohibitions on endangered species to all threatened species unless the Service has issued a special rule to govern a particular species. 50 C.F.R. §§ 17.31(a), (c); *see also Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 5 (D.C. Cir. 1993).

Both elephants and lions in Zimbabwe are listed as threatened species under the ESA, 50 C.F.R. § 17.11(h), and both are the subject of special species-specific rules for importation. *Id.* §§ 17.40(e) (elephants), (r) (lions).

Under the species-specific rule, sport-hunted elephant trophies may only be imported into the United States if, among other things, a "determination is made that the killing of the trophy animal will enhance the survival of the species and the trophy is accompanied by a threatened species permit issued under § 17.32." *Id.* § 17.40(e)(6)(i)(B). The required enhancement finding is "communicated through the threatened species permitting process." 80 Fed. Reg. 45,154-01, 45, 165.

Like for African elephants, the species-specific rule for African lions requires a hunter to apply for and receive a threatened species import permit before importing a sport-hunted African lion trophy from countries like Zimbabwe. 80 Fed. Reg. 80,000, 80,043–44; 50 C.F.R. § 17.40(r)(2)–(3). Although the rule does not explicitly mention enhancement findings, the enhancement of propagation or survival is one of the purposes for which a threatened species import permit may be issued. *See* 50 C.F.R. § 17.32 (listing enhancement along with scientific purposes, economic hardship, zoological exhibition, educational purposes, and incidental takings as the acceptable purposes for issuing a permit). Because of the nature of sport-hunted trophy importation, a permit for lions may only be issued if the Service determines that the killing and importation enhances the survival of the species. "The Service has the discretion to make the required findings on sport-hunted trophy imports of [African lions] on a country-wide basis, although individual import permits [are] evaluated and issued or denied for each applicant." 80 Fed. Reg. at 80,046.

## B. Factual and Procedural Background

In 2014, the Service suspended importing of sport-hunted African elephant trophies from Zimbabwe, as the Service was "unable to determine that the killing of the animal . . . would enhance the survival of the species in the wild." 79 Fed. Reg. 44459-01. In 2015, the Service reaffirmed this decision, extending its effect indefinitely. 80 Fed. Reg. 42524-03. The intervenor-defendants challenged the 2014 and 2015 elephant findings in a case before this Court. *Safari Club Int'l v. Jewell*, Case No. 1:14-cv-670-RCL. Although this Court upheld the 2014 and 2015 elephant findings, *see Safari Club Int'l v. Jewell*, F. Supp. 3d 48, 81 (D.D.C. 2016), the D.C. Circuit held that the findings were legislative rules that the Service failed to subject to public notice and comment under the Administrative Procedure Act. *Safari Club II*, 878 F.3d at 333. It therefore

ordered this Court to remand the case to the Service to initiate proper rulemaking to address enhancement findings for the relevant time periods. *Id.* at 336.

But prior to the D.C. Circuit's opinion, the Service had issued the new enhancement findings at issue in this case. On October 11, 2017, the Service announced that made positive enhancement findings and would allow the import of African lion trophies hunted in Zimbabwe in calendar years 2016, 2017, and 2018. Second Am. Compl. ¶ 144. And on November 16, 2017, the Service similarly concluded that hunting elephants in Zimbabwe enhances the survival of the species, opening the door for the importation of elephant trophies hunted in 2016, 2017, and 2018. *See* 82 Fed. Reg. 54,405.

On November 20, 2017, the Center filed this suit, asserting these new findings were arbitrary and capricious. *See generally* Compl., ECF No. 1. The D.C. Circuit issued its *Safari Club II* opinion regarding the 2014 and 2015 elephant findings in December 2017, and not long after, the Center amended the complaint to add plaintiffs HSI, HSUS, Born Free USA, and Ian Michler, and to add claims that the 2017 findings also failed to comply with the APA public notice and comment requirements. *See generally* Am. Compl, ECF No. 20.

On March 1, 2018, the Principal Deputy Director of the Service signed a memorandum (the "March Memo") announcing the withdrawal of the 2014 and 2015 Zimbabwe elephant findings in response to *Safari Club II*. Second Am. Compl. ¶ 168; Intervenor-Defendants' Mot. Dismiss Ex. 1, ECF No. 42-1.[1] "Consistent with this approach," the Service also withdrew the

---

[1] The Court will consider the March Memo in conjunction with this motion. Defendants move to dismiss the case both for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). When considering a motion to dismiss for lack of jurisdiction, the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). For 12(b)(6) motions, "where a document is referred to in the complaint and is central to plaintiffs claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Vanover v. Hantman*, 77 F.Supp.2d 91, 98 (D.D.C.1999) (citing *Greenberg v. The Life Insurance Company of Va.*, 177 F.3d 507, 514 (6th Cir.1999)); *see also Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) (holding that district court may consider stock purchase agreement, offering memorandum, and

2017 Zimbabwe lion and elephant enhancement findings challenged in this case, along with various country-wide enhancement and non-detriment findings. Intervenor-Defendants' Mot. Dismiss Ex. 1; Second Am. Compl. ¶ 168. Moreover, the March Memo announced that "[a]t this time, when the Service processes [permit application for the importation of sport-hunted trophies of these species], the Service intends to do so on an individual basis, including making ESA enhancement determinations, and CITES non-detriment determinations when required, for each application." Intervenor-Defendants' Mot. Dismiss Ex. 1. In other words, the Service announced an intention "to grant or deny permits to import a sport-hunted trophy on a case-by-case basis." *Id.* However, the March Memo makes clear that the Service intends to use the information cited in the 2017 Zimbabwe lion and elephant findings and other withdrawn findings "as appropriate, in addition to the information it receives and has available when it receives each application, to evaluate individual permit applications." *Id.*; Second Am. Compl. ¶ 169. The March Memo was not published in the Federal Register and the Service did not solicit public comments on the Memo. Second Am. Compl. ¶ 170.

In response to the March Memo, plaintiffs amended the complaint to add two counts: a claim challenging the Service's failure to employ notice-and-comment rulemaking to withdraw the 2017 lion and elephant findings and a claim that the Service violated the APA by changing to a case-by-case approach for making enhancement and non-detriment findings without soliciting public notice and comment. *Id.* ¶¶ 202–211. Both the government and the defendant-intervenors move to dismiss the Second Amended Complaint in its entirety. The defendants argue that plaintiffs' claims challenging the 2017 lion and elephant findings—claims one through six—

---

warrant, on a motion to dismiss, even when these materials were not attached to complaint). Here, the March Memo is properly considered because it is central to the plaintiffs' claims, and the complaint even quotes directly from it. *See* Second Am. Compl. ¶ 169, ECF No. 41.

should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction, while the new claims—claims six and seven—should be dismissed either under Rule 12(b)(1) for lack of subject matter jurisdiction or under Rule 12(b)(6) for failure to state a claim.

## II.  LEGAL STANDARD

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citations omitted)); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept a plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

### A.  Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C.2002). Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C.Cir.2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir.

2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri*, 782 F.2d at 241. Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F.Supp.2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)); *see also Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## B. Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 566). A pleading must offer more than "'labels and conclusions'" or a "'formulaic recitation of the elements of a cause of action,'" *id.* (quoting *Twombly*, 550 U.S. at 555), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in the plaintiff's favor, and the Court should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276

(D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

### C. APA Notice-and-Comment Rulemaking

Under the APA, when an agency proposes to promulgate a rule, it must follow the procedures set out in 5 U.S.C. § 553. Among other things, the statute requires the agency to publish a notice "of proposed rule making" in the Federal Register. *Id.* § 553(b). Then, it must "give interested persons an opportunity to participate in the rule making through submission" of comments, which the agency must consider. *Id.* § 553(d).

## III. ANALYSIS

### A. Claims one through six are moot.

In claims one through six, plaintiffs make specific challenges to the 2017 elephant and lion findings, claiming they were issued arbitrarily and capriciously or otherwise not in accordance with law and also that the Service failed to follow proper rulemaking procedures in issuing them. Second Am. Compl. ¶¶ 171–201. Plaintiffs ask this Court to declare that the 2017 findings violate the APA, to declare that the Service failed to undertake the required notice-and-comment rulemaking process, and to set aside and remand the challenged enhancement findings. *Id.* at 43. But the 2017 findings were withdrawn by the March Memo.

Under Article III, the "judicial power" extends only to "Cases" and "Controversies." U.S. Const. art. III, s 2. "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citations and internal quotation marks omitted). And "no justiciable controversy is presented . . . when the parties are asking for an

advisory opinion, [or] when the question sought to be adjudicated has been mooted by subsequent developments." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). A "case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). "Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982).

Here, the challenged findings are no longer in effect. The Court, therefore, can provide the plaintiffs with no meaningful relief. The fact that they seek declaratory relief—in addition to injunctive relief—does not change the analysis. "The Article III case or controversy requirement is as applicable to declaratory judgments as it is to other forms of relief." *Conyers v. Reagan*, 765 F.2d 1124, 1127 (D.C. Cir. 1985).

The Court cannot set aside findings that have already been withdrawn. And to declare that the withdrawn findings violate the APA for the purpose of instructing the Service how to approach future findings amounts to an advisory opinion. Federal courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998).

Plaintiffs argue that claims one through six are not moot because the Service stated it will use the information from the findings as appropriate to evaluate individual permit applications. *See* Intervenor-Defendants' Mot. Dismiss Ex. 1. In fact, plaintiffs submit examples of individual permit enhancement findings that it claims "are cookie cutter copies of the 2017 country-wide Zimbabwe lion trophy enhancement finding Plaintiffs challenged except for their opening paragraph and conclusions." Pls.' Notice Suppl. Authority 2, ECF No. 48. Therefore, in plaintiffs' view, the 2017 findings have continuing effect.

The Court is not persuaded. Whether or not the Service relies on the same information to make its individual enhancement determinations does not give the withdrawn country-wide findings any operational effect in and of themselves. Instead, the proper vehicle to challenge the Service's methods in coming to an enhancement finding is to challenge the new enhancement determinations themselves—the findings that actually affect the ability to import sport-hunted trophies. In other words, these new enhancement findings do not create a live controversy over old ones.

Furthermore, plaintiffs cannot rely on an exception to the mootness requirement under either the doctrine of "actions capable of repetition yet evading review" or because of the defendant's voluntary cessation of offending conduct.

The capable-of-repetition-yet-evading-review exception applies where a party demonstrates that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action." · *Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990). Here, plaintiffs point to the Service's intent to continue to rely on the 2017 factual findings and state that "denying [them] their day in court now because they could allegedly raise the same issues in permit challenges down the road would amount to evading review." Pls.' Opp. Mot. Dismiss 38, ECF No. 45.

This argument misses the mark. Plaintiffs do not—and could not—argue that were the Service to issue country-wide enhancement findings like those challenged in this case that they would evade review. After all, the D.C. Circuit's did just that in *Safari Club II* for the 2014 and 2015 enhancement findings. And plaintiff cannot save their claims from the mootness doctrine on the basis that future litigation challenging not country-wide findings but instead the issuance of a

specific import permit might evade review. If the concern is that those individual adjudication decisions are too short in duration to be fully litigated, the capable-of-repetition-yet-evading-review exception can be applied in that context.

The voluntary cessation doctrine is equally inapplicable. The idea behind the exception is that a "defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of Earth v. Laidlaw*, 528 U.S. 167, 189 (2000) (internal citations omitted). Here, the 2017 findings suffered from the same procedural deficiencies as the 2014 and 2015 findings from *Safari Club II*: The Service failed to employ notice-and-comment rulemaking in enacting what amounted to a legislative rule. *See Safari Club II*, 878 F.3d at 333. So, the withdrawal of the 2017 findings were not a voluntary cessation but rather a corrective action by the Service. And "[c]orrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council*, 680 F.2d at 814. This is "more accurately characterized as the provision of appropriate relief to petitioner than as the 'cessation of illegal conduct.'" *Id*. at 814 n.8.

Because claims one through six challenge the withdrawn 2017 country-wide elephant and lion findings, there is no live controversy. Moreover, no mootness exception applies. The Court lacks jurisdiction to here these claims, and they must be **DISMISSED**.

### B. Plaintiffs lack standing to challenge the withdrawal of positive enhancement findings and fail to state a claim challenging the rescission of negative findings prohibiting trophy imports.

In claim seven, plaintiffs allege that the Service failed to comply with the APA when it rescinded prior enhancement and non-detriment findings in the March Memo without public notice and comment. Second Am. Compl. ¶¶ 202–07. This claim greatly broadened the scope of this action because plaintiffs challenge not only the rescission of the 2017 elephant and lion findings,

but also the withdrawal of all the findings mentioned in the March Memo.[2] *See id.*; Pls.' Opp. Mot. Dismiss 41. These included both positive enhancement findings, paving the way for the importation of sport-hunted trophies, and negative enhancement findings, prohibiting the importation of such trophies. Pls.' Opp. Mot. Dismiss 41; *see also* Intervenor-Defendants' Mot. Dismiss Ex. 1. For the reasons stated below, plaintiffs lack standing to maintain a challenge to the rescission of any positive enhancement findings. And although plaintiffs sufficiently alleged facts to challenge some of the negative findings prohibiting trophy imports, plaintiffs nonetheless fail to state a claim upon which relief may be granted. So, claim seven will be **DISMISSED**.

> i. *Plaintiffs lack standing to challenge the withdrawal of positive enhancement findings.*

In order to bring a suit, litigants must establish Article III standing. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1156–57 (D.C. Cir. 2005). Standing contains three elements:

> (1) the plaintiff must have suffered injury in fact, an actual or imminent invasion of a legally protected, concrete and particularized interest; (2) there must be a causal connection between the alleged injury and the defendant's conduct at issue; and (3) it must be "likely," not "speculative," that the court can redress the injury.

*Id.* at 1157 (quoting *Lujan*, 504 U.S. at 560–61). "[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Plaintiffs must separately demonstrate standing with respect to each claim. *Daimler-Chrysler Corp. v. Cuno*, 54 U.S. 332, 352 (2006).

"Whether a party's claim requires dismissal because of an inability to establish standing depends on the stage of the litigation." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d

---

[2] In addition to the 2017 Zimbabwe lion and elephant findings, the March Memo withdrew the following enhancement findings: 1997, 2014, and 2015 findings for elephants in Zimbabwe; 1997, 2014, and 2015 findings for elephants in Tanzania; a 1995 finding for elephants in South Africa; a 1997 finding for bontebok taken in South Africa; 2016 and 2017 findings for lions in South Africa; a 1997 finding for elephants in Botswana; 1995 finding for elephants in Namibia; a 2012 finding for elephants in Zambia; a 2017 finding for lions in Zambia; and the 2017 finding for elephants in Zambia. Intervenor-Defendants' Mot. Dismiss Ex. 1, ECF No. 42-1. Additionally, the Service withdrew the following CITES non-detriment findings: 2014, 2015, and 2017 finding for elephants in Tanzania; and 2017 finding for elephants in Zambia. *Id*

905, 913 (D.C. Cir. 2015). At the pleadings stage, plaintiffs "must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Bennett v. Spear*, 520 U.S. 154, 167–68 (1997). However, the Court does "not assume the truth of legal conclusions, nor do[es it] accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

The plaintiffs in this case include "conservation organizations and a local safari guide with vested interests in the protection of elephants and lions in Africa." Second Am. Compl. ¶ 4. The organizations claim associational standing, Pls.' Opp. Mot. Dismiss 36 n.15, and the safari guide— Mr. Michler—claims standing in his own right. Second Am. Compl. ¶ 11. "An association 'has standing to sue under Article III of the Constitution of the United States only if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit.'" *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (quoting *Rainbow/Push Coal. v. FCC*, 330 F.3d 539, 542 (D.C. Cir. 2003)). The Court "need only find one party with standing." *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013).

Here, neither Mr. Michler nor any of the various associations' members suffer an injury in fact from the March Memo's rescission of positive enhancement findings. The plaintiffs' entire case is premised on the proposition that allowing the importation of sport-hunted trophies from

certain countries into the United States increases both the legal and illegal killing of African wildlife, harming the plaintiffs' aesthetic, professional, scientific, recreational, and organizational interests. *See* Second Am. Compl. ¶¶ 8–14, 65–71; Decl. Brendan Cummings ¶¶ 22–26, ECF No. 45-1; Decl. Audrey Delsink ¶¶ 19–20, ECF No. 45-2; Decl. Ian Michler ¶¶ 9–11, ECF No. 45-3; Decl. Brett Hartl ¶¶ 14, 16, ECF No. 45-4; Decl. Prashant K. Kehtan ¶ 10, ECF No. 45-5.

As previously described, elephant and lion trophies may not be imported to the United States absent a finding that the killing of the animals enhances the survival of the species. *Supra* Part I.A. A *positive* enhancement finding, then, leads to increased killing of African wildlife under plaintiffs' own theory. This point is only buttressed by plaintiffs' desire to set aside the 2017 positive elephant and lion findings in claims one through six.

Here, the March Memo withdraws a number of positive enhancement findings, explicitly stating that they "are no longer effective for making individual permit determinations for imports of those sport-hunted ESA-listed species." Intervenor-Defendants' Mot. Dismiss Ex. 1. In other words, a permit applicant may no longer rely on the withdrawn findings in order to gain permission to import a trophy to the United States.

Where, as here, "plaintiffs allege injury resulting from violation of a procedural right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability, but not the issues of injury in fact or causation." *Ctr. for Law & Educ.*, 396 F.3d at 1157. But here, plaintiffs put forth no plausible theory for how the withdrawal of these *positive* enhancement findings without public notice and comment equates to an injury in fact either for Mr. Michler or a member of one of the organizations.

Plaintiffs argue that the March Memo "signals to the trophy hunting community that [the Service] intends to follow the allegedly withdrawn decisions by continuing to rely on the information therein," and "[t]hus, for all intents and purposes the 'withdrawn' decisions are still operational." Pls.' Opp. Mot. Dismiss 38. The Court finds the harm from the March Memo's "signaling" entirely speculative. After all, he March Memo also rescinds negative findings prohibiting trophy imports and yet says that the Service "intends to use the information cited in these findings and contained in its files as appropriate." Intervenor-Defendants' Mot. Dismiss Ex. 1. What does this signal? Ironically, plaintiffs argue that the March Memo's "withdrawal of [the negative] findings raises concerns that [the Service] could reverse course at any time causing injury to Plaintiffs' interests." Pls.' Opp. Mot. Dismiss 41. Is the same not true of the withdrawal of the positive enhancement findings?

Plaintiffs do not adequately resolve these inconsistencies. The Court is left with the most obvious conclusion: if, as plaintiffs describe, positive findings "authoriz[e] trophy imports and promot[e] the killing of threatened and endangered species," *id.* at 38, then plaintiffs are not harmed by the rescission of such findings. Because there is no injury in fact, plaintiffs lack standing to challenge the withdrawal of the positive enhancement findings.[3]

> ii. *Plaintiffs claims challenging the rescission of negative findings prohibiting trophy imports must also be dismissed.*

In addition to rescinding positive enhancement findings, the March Memo withdrew "negative findings prohibiting trophy imports, including the 2014 and 2015 Zimbabwe and Tanzania elephant enhancement findings, the 2014, 2015, and 2017 Tanzania elephant non-

---

[3] Plaintiffs are somewhat unclear in their pleadings as to which standing arguments they put forth for each claim. *See* Pls.' Opp. Mot. Dismiss 41, ECF No. 45 ("Plaintiffs are harmed by the failure to conduct notice and comment on the rescission of both categories of findings and adoption of the March 1 memo (and denial of any future public process) in three ways."). From the Court's reading, the remainder of plaintiffs' standing arguments relate to claim eight.

detriment findings, and the 2016 and 2017 South Africa captive lion enhancement findings." Pls.' Opp. Mot. Dismiss 41. Plaintiffs likewise claim injury from the failure to conduct proper notice-and-comment rulemaking procedures prior to the rescission of the negative findings. *Id.*

The Court begins with standing. As mentioned, an association has standing to sue only if "(1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit.'" *Am. Trucking Ass'ns.*, 724 F.3d at 247 (internal citations omitted). The Court easily finds the latter two requirements met for the Center.[4] The Center's mission is "to secure a future for all species, great and small, hovering on the brink of extinction." Decl. Brendan Cummings ¶ 3. It stands to reason that participating in the rulemaking process when the Service withdraws findings aimed at protecting wildlife is germane to the Center's mission. *See id.* ¶ 26. Furthermore, neither claim seven nor the relief requested therein requires the Center's members to participate in the lawsuit.

Therefore, the standing inquiry hinges on whether at least one of the Center's members would have standing to sue in his own right. As an initial matter, claim seven alleges a procedural injury—withdrawal of the negative findings without notice and comment. Second Am. Compl. ¶¶ 202–207. As discussed, for procedural injuries, courts "relax the redressability and imminence requirements of standing . . . [but] the injury in fact requirement is a hard floor of Article III jurisdiction that cannot be altered by statute." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182–83 (D.C. Cir. 2017) (citations and quotations omitted). And "[l]ikewise, the Supreme Court 'has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some

---

[4] The Court focuses on the Center because, as discussed below, one of its members plausibly alleges an injury in fact. The Court finds no demonstrable difference between the causation and redressability analyses for each plaintiff.

reasonably increased risk of injury to its particularized interest." *Id.* at 183 (quoting *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996)).

Plaintiffs' claims to an injury from the withdrawn negative findings fare much better than their claimed injury from the withdrawn positive findings. These negative findings prevented hunters from importing sport-hunted trophies during the relevant time period. The Center's member Brett Hartl has plans to travel to Tanzania and Zimbabwe in 2019, Decl. Brett Hartl ¶ 11, and then plans to visit South Africa in 2021, *id.* ¶ 13. On his coming trips, Mr. Hartl hopes to see elephants and lions. *Id.* ¶¶ 11, 12, 17. "Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562–63. Because Mr. Hartl has plausibly alleged plans to go to Tanzania, Zimbabwe, and South Africa, he would be harmed if withdrawing these negative findings without notice and comment causes the elephant and lion population to diminish.

That brings the Court to causation. To establish causation in the context of procedural injury, a plaintiff must show "two causal links: 'one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury.'" *Ctr. for Biological Diversity*, 861 F.3d at 184 (quoting *Fla. Audubon Soc.*, 94 F.3d at 668). Regarding the first link, the failure to conduct notice-and-comment rulemaking is plainly "connected" to the withdrawal of the negative findings since the Service made the decision without engaging the public.

But the Court has more difficulty connecting the substantive decisions—*i.e.* withdrawing the negative findings—to plaintiffs' particularized injury. For the second link, plaintiffs "must still demonstrate a causal connection between the agency action and the alleged injury." *City of*

*Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2017). Plaintiffs plausibly allege that U.S. hunters may be unwilling to hunt elephants and lions if they are unable to import their trophies. *See* Pls.' Opp. Mot. Dismiss 47 (citing declarations from *Safari Club Int'l v. Jewell*, 1:14-cv-670-RCL). But that does not end the inquiry.

The majority of the withdrawn negative findings are neither cited in the pleadings nor included in the record. But one that is—the 2014 Zimbabwe elephant finding—reveals a causation problem with some of these withdrawn findings. 79 Fed. Reg. 44459-01. The 2014 finding only applies to "elephant trophies taken in Zimbabwe on or after April 4, 2014, until December 31, 2014." *Id.* In other words, this finding—and perhaps other withdrawn negative findings—applies only to elephants killed during a specific time period. By 2017 when plaintiffs filed their complaint, the number of elephants killed in Zimbabwe between April 4, 2014 and December 31, 2014 was fixed. And the Service's decision has no impact on elephant's killed from 2015 on. Therefore, the substantive decision to withdraw the 2014 Zimbabwe elephant findings could have no impact on whether Mr. Harl observes any elephants on his future trips. And the same would be true for Mr. Michler and all organizational plaintiffs' members. The plaintiffs' injuries are not fairly traceable to any withdrawn negative findings that are time-limited. And thus the plaintiffs have no standing to challenge the withdrawal of any such findings.

The 2015 Zimbabwe elephant findings, on the other hand, suspended the importation of "elephant trophies taken in Zimbabwe through the 2015 hunting season *and future hunting seasons.*" 80 Fed. Reg. 42524-03. Under plaintiffs' theory, the withdrawal of these findings without notice and comment conceivably creates a "demonstrable risk" to plaintiffs' interests in observing, enjoying, conserving, and photographing elephants in Zimbabwe at the time the case was filed and into the future. *See Ctr. for Biological Diversity*, 861 F.3d at 185.

Furthermore, the plaintiffs meet the "relaxed redressability requirement," as to the 2015 Zimbabwe elephant findings and others with indefinite effect. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013). "A procedural-rights plaintiff need not show that "court-ordered compliance with the procedure would alter the final agency decision." *Ctr. for Biological Diversity*, 861 F.3d at 186 (internal citation and quotation omitted). Instead, the Center needs to show that had the Service engaged in notice-and-comment rulemaking it *could* have reached a different result. *Id.* At this stage of the proceedings, plaintiffs' pleadings clear this hurdle.

But although plaintiffs have plausibly alleged standing to challenge the withdrawal of negative findings with continuing effects, these claims still must be dismissed under Rule 12(b)(6).

Plaintiffs claim centers around the Service's failure to conduct notice-and-comment rulemaking when withdrawing the country-wide findings. Before the decision in *Safari Club II*, the Service treated country-wide enhancement and non-detriment findings as adjudications not subject to the rulemaking requirements of 5 U.S.C. § 553. 878 F.3d at 331. But in that case, the Circuit held that because the 2014 and 2015 elephant enhancement findings at issue were *generally applicable* to all potential imports of sport-hunted elephant trophies from Zimbabwe and because they were meant to only bind hunters in *future* permitting adjudications and enhancement actions, they were final rules under the APA and required notice and comment. *See id.* at 331–34 (discussing the differences between a rule and adjudication and finding that the former applied to the 2014 and 2015 findings). This led the Service in the March Memo to withdraw the procedurally defective 2014 and 2015 findings, along with all other country-wide findings not subjected to notice and comment, including the negative findings presently before the Court. Second Am. Compl. ¶ 168; Intervenor-Defendants' Mot. Dismiss Ex. 1. But because the Circuit held that these types of country-wide findings constituted legislative rules, plaintiffs argue that the repeal of those

findings was itself a rule requiring notice and comment. Second Am. Compl. ¶¶ 205–206; *see also* Pls. Opp. Mot. Dismiss 13. In other words, "[t]he fact that the Service issued at least sixteen country-wide enhancement findings in the past twenty-five years without complying with the APA does not justify rescission of those rules by repeating the same illegal conduct—simply put, two wrongs do not make a right." Pls. Opp. Mot. Dismiss 13.

The Court considered this same argument upon remand from the Circuit in *Safari Club Int'l v. Zinke*. *See* Order, No. 14-cv-670-RCL, ECF No. 157. There, many of the organizational plaintiffs in this case were intervenor-defendants and argued that the Court "should retain jurisdiction" even after March Memo "because the Service's attempt to repeal the findings was itself procedurally deficient under the APA." *Id*. at 4.

Then, as now, the Court is unpersuaded. *Id*. In *Safari Club II*, the Circuit found the country-wide findings were procedurally deficient precisely because the Service did not conduct notice-and-comment rulemaking in the first place. While the Service intended to proceed by adjudication, the Circuit made clear that country-wide findings of that type were more akin to legislative rulemaking. The plaintiffs have not alleged any differences between the 2014 and 2015 Zimbabwe elephant findings and the rest of the negative findings under the Court's consideration making them more properly considered adjudications. The Service withdrew the procedurally deficient findings in order to comply with that ruling. There is no need to go through rulemaking to undo an approach plainly held improper by the Circuit.

The cases plaintiffs cite in support of its position are inapposite. They stand for the proposition that an agency may not exclude itself from notice and comment requirements simply by declaring that the rule is "defective" on its own accord. *See Consumer Energy Council v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982) ("The . . . argument that notice and comment

requirements do not apply to 'defectively promulgated regulations' is untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation."); *Nat'l Treasury Emp. Union v. Cornelius*, 617 F.Supp. 365, 371 (D.D.C. 1985) ("It would significantly erode the usefulness of the APA if agencies were permitted unilaterally to repeal regulations dealing with the substantive rights of individuals under federal statutes, by declaring that the earlier regulations were just a mistake."). The idea being that when an agency declares a rule defective, *sua sponte*, "the question whether the regulations are indeed defective is one worthy of notice and comment." *Consumer Energy Council*, 673 F.2d at 447 n.79. True enough, but if we applied that line of cases to situations where there had been an intervening change in law, it would force agencies to enforce plainly wrong— and maybe even unconstitutional—regulations until either a Court struck them down or the agency went through the full notice and comment process. That cannot be.

Here, the D.C. Circuit (not the agency itself) found the rules to be procedurally defective— so there is no question whether the rules are indeed defective. *Cf. Nat'l Treasury Emp. Union*, 617 F.Supp. at 371 (noting "[n]o intervening events have occurred which would cast doubt on the validity of the regulations, such as . . . a relevant court decision."). The plaintiffs point to no case where a court has required an agency to go through notice-and-comment in order to withdraw a rule that was found to be deficient because it itself did not go through notice-and-comment. Claim seven is **DISMISSED**.

### C. Plaintiffs lack standing to challenge the March Memo's announcement that the Service would henceforth issue enhancement and non-detriment findings on a case-by-case basis as part of the permitting process.

In addition to withdrawing country-wide enhancement and non-detriment findings, the March Memo also announced that the Service will no longer make enhancement and non-detriment

findings on a country-wide basis. Intervenor-Defendants' Mot. Dismiss Ex. 1. Instead, the Service will make those determinations on a case-by-case basis when deciding whether or not to grant a permit. *Id.*; Second Am. Compl. ¶ 209. In claim eight, plaintiffs argue that this is a substantive policy change that cannot be enacted without soliciting public notice and comment. *Id.* ¶ 210. In response, defendants argue that plaintiffs lack the requisite standing to challenge the alleged "policy." Federal Defs.' Mot. Dismiss 20–24, ECF No. 44. The Court agrees.

The standing analysis for claim eight differs significantly from plaintiffs' other claims. Because this aspect of the March Memo only changes the manner in which enhancement and non-detriment findings, plaintiffs cannot plausibly allege that switching to a case-by-case system, alone, causes more elephants and lions to be killed. Therefore, neither the organizations (through their members) nor Mr. Michler, the safari guide, may rely on aesthetic or recreational interests as a basis for standing. Instead, plaintiffs' best argument is that the organizations themselves are harmed by the change in policy and have standing to sue. Unfortunately for plaintiffs, this argument fails as well.[5]

To establish standing in its own right, an organization must, "like an individual plaintiff, [] show 'actual or threatened injury in fact that is fairly traceable to the illegal action and likely to be redressed by a favorable court decision.'" *Equal Right Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). Like claim seven, claim eight alleges a procedural harm; so redressability and imminence will be relaxed while injury in fact and causation will not.

---

[5] Although the federal defendants mention informational standing in their motion to dismiss, *see* Federal Defs.' Mot. Dismiss 23, plaintiffs put forth no argument for informational standing in their opposition and fail to identify any statute entitling them to any information deprived under the Service's new policy. *See Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (stating that in order to claim informational, a plaintiff must allege: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.").

To demonstrate injury in fact, "[a]n organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Food & Water Watch*, 808 F.3d at 919 (quoting *Nat'l Taxpayers Union, Inc. v. United Staes*, 68 F.3d 1428, 1433 (D.C. Cir. 1995). Rather, an organization wishing to establish standing must have "suffered a concrete and demonstrable injury to [its] activities." *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (internal quotations omitted). This determination is made through a two-part inquiry—the Court asks "first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *Id.* at 1094.

To satisfy these elements, the challenged conduct must "perceptibly impair[] the organization's ability to provide services." *Food & Water Watch*, 808 F.3d at 919. It must inhibit the organization's daily operations, *PETA*, 797 F.3d at 1094, or "ma[k]e the organization's activities more difficult." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

Of the organizations, only the Center outlines how the change to case-by-case determinations affects its operations. The Center's "primary mission is to protect threatened and endangered species and their habitats in the United States and abroad." Cummings Decl. ¶ 4. "As part of its mission, the Center provides oversight of governmental programs, polices, and activities that affect wildlife, endangered species, and natural areas." *Id.* ¶ 6. Because the new case-by-case approach precludes the Center from "receiv[ing] any notice or the opportunity for comment" when enhancement or non-detriment is being considered, the Center claims its "only recourse is to request all such information under FOIA." *Id.* ¶ 19. The more frequent need for FOIA requests will "inevitably require the dedication of staff time and resources above and beyond what [the Center] currently deploy[s] to ensure they are regularly submitted by [the Center] and timely and

adequately responded to by the agency." *Id.* ¶ 20. Additionally, because of the March Memo, the Center claims it "has been and will continued to be forced to spend additional resources attempting to meaningfully engage in FWS's decision-making processes." *Id.* ¶ 22. For example, it "will have to dedicate more of the limited time and resources of [its] small international program to providing, for example, new scientific studies on trophy hunting, the population status of elephants or lions in different countries or regions, governance in specific countries, and other relevant information to FWS." *Id.* Plaintiffs argue that this "consequent drain on [] resources, which could be dedicated to other conservation efforts, supports their organizational standing here." Pls.' Opp. Mot. Dismiss 51.

But two flaws doom plaintiffs' argument. First, on its face, the alleged "policy" in the March Memo has an indeterminate effect on the Center's primary mission to protect threatened and endangered species and their habitats in the United States and abroad. The change to case-by-case adjudication does not by itself suggest that more sport-hunted trophies will be imported to the United States. And the D.C. Circuit has cautioned that "[i]f the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission, [the Circuit has] found it 'entirely speculative' whether the challenged practice will actually impair the organization's activities." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't*, 659 F.3d 13, 25 (quoting *Nat'l Treasury Emps. Union*, 659 F.3d at 25).

Second, and more pointedly, D.C. Circuit "precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury." *Food & Water Watch*, 808 F.3d at 919. "This is true whether the advocacy takes place through litigation or administrative proceedings." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015). Because of the shift to case-by-case

evaluation, the Center argues that it will have to devote more resources to FOIA actions and providing more updated information to the Service in order to challenge sport-hunted trophy importation. But these increased expenditures relate directly and exclusively to pure issue-advocacy. *See Ctr. for Law & Educ.*, 396 F.3d at 1162 (rejecting a claim to organizational standing when "the only 'service' impaired is pure issue-advocacy"). In other words, plaintiffs' asserted injury "is essentially an argument that [the Center] cannot allocate issue advocacy expenses in the way it would prefer, which is insufficient to establish standing." *Ams. for Safe Access*, 706 F.3d at 458.

In sum, plaintiffs lack standing to challenge claim eight. Accordingly, it must be **DISMISSED** for want of jurisdiction.

## IV. CONCLUSION

The Court lacks jurisdiction to hear the majority of plaintiffs claims. Claims one through six are moot. Additionally, plaintiffs lack standing to challenge the Service's withdrawal of positive enhancement findings and its decision to change from country-wide to case-by-case enhancement and non-detriment determinations. And while plaintiffs have plausibly alleged standing to challenge the withdrawal of certain negative enhancement and non-detriment determinations, plaintiffs fail to state a claim upon which relief may be granted. As such, the case will be **DISMISSED**. A separate order will issue.

Date: 3/29/19

ROYCE C. LAMBERTH
United States District Judge